Levine Contempt Case.

614

Argued October 1, 1952. Before STERN, STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

reargument refused March 24, 1953.

*John S. Powers,* with him *Frank O. Moretti* and *Michael A. Barletta,* for appellant.

*J. Glenn Berry,* with him *Cobau & Berry,* for appellee.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, February 14, 1953:

Contempt proceedings against a member of the bar are fortunately rare, but they cannot well be avoid-

ed when a judge is reasonably of the belief that conduct of the offender has been such as to impair the authority and dignity of the court.

In Lawrence County the courts consist of HON. W. WALTER BRAHAM, the President Judge, and HON. JOHN G. LAMOREE, the Additional Law Judge. The District Attorney is Sherman K. Levine and he has one Assistant. On Friday, November 30, 1951 Judge BRAHAM was presiding in one of the two courtrooms in a dispute involving the opening of some ballot boxes, following which there were two "non-support" cases to be heard; Judge LAMOREE was presiding in the other courtroom, taking guilty pleas and sentencing defendants. Both the District Attorney and his Assistant were in the latter room helping to dispose of the business there being transacted. It appears that it had been more or less customary, in order to expedite the proceedings, for both the District Attorney and his Assistant to officiate in the same room when pleas were being taken and sentences imposed. When Judge BRAHAM was ready to take up the non-support cases he sent a messenger to Judge LAMOREE'S room to tell the District Attorney that his attendance was required in Judge BRAHAM'S court. The District Attorney returned word that he and his Assistant were busy in Judge LAMOREE'S court and they would come over to Judge BRAHAM'S room as soon as they could. Shortly thereafter Judge BRAHAM sent a similar message to which the District Attorney made the same reply; a third request met with the same response. Finally, some two hours after court had opened, the Assistant came into Judge BRAHAM'S room, followed shortly thereafter by the District Attorney himself. Judge BRAHAM thereupon asked the latter why he had not provided a district attorney for his room, whereupon, according to a finding of Judge BRAHAM, "He then broke into a rude

and insolent denunciation of the Court saying 'that's the way with this court, always mixing things up; everything is set on one day' ". The Judge then said: "The people of this county are paying for two district attorneys. They are entitled to have one in each courtroom." To this the District Attorney replied: "The people of this county are getting their money's worth from the district attorney's office." Judge BRAHAM states that people in the courtroom could not help knowing that the District Attorney had ignored his requests for attendance; also that the interchange of remarks above set forth were audible to the many persons there present.

On Monday, December 3, Judge BRAHAM, not having received any explanation or apology from the District Attorney, called him into his chambers and there said to him that he would give him this alternative,— either to appear in court for a public rebuke or be cited for contempt; at the same time the Judge expressed friendly feelings toward the District Attorney and his great regret at being obliged to take such action, but stated that he was charged with preserving the dignity and authority of the Lawrence County courts of which he was the President Judge. The next day the District Attorney wrote him a letter in which he said that his conduct had not been such as to require any explanation or apology, and that he could not, in justice to himself, submit to any public reproof; the letter proceeded: "Your statements regarding the friendly relations between us are insincere and do not impress me. I believe the fact that your conduct in certain matters is now under investigation by my office had no little to do in motivating your present action."

On December 4 the court issued a rule upon the District Attorney to show cause why he should not be adjudged guilty of contempt of court, to which the Dis-

trict Attorney filed an answer; a hearing was held on December 17 at which time witnesses were called both by Judge BRAHAM and by the District Attorney. Counsel for the latter requested that a judge other than Judge BRAHAM be assigned to hear the case, on the ground that the issue was between him and the District Attorney and involved personal feelings, to which Judge BRAHAM properly replied that the issue was between the Court of Quarter Sessions of the County and the District Attorney, and that there was no personal animosity between himself and the latter; accordingly he refused to disqualify himself. Just before the hearing was had the District Attorney sent to Judge BRAHAM a letter in which he said that the statement in his letter of December 4 about an investigation being conducted by his office was not intended to be in the nature of a "threat" but was merely an answer to the Judge's professed friendship for him and his office which he felt to be insincere.

On January 23, 1952 Judge BRAHAM filed an adjudication with findings of fact, a discussion, and conclusions of law. He found that the defendant had been guilty of three acts of contempt; (1) his "insulting and contemptuous denunciation of the President Judge in open court on November 30 for fixing cases contrary to the wishes of the District Attorney;" (2) his "failure, upon reasonable request, to provide the assistance of a district attorney for the court in Court Room Number 1 on the same day;" (3) "the writing of the insulting letter of December 4". Sentence was imposed upon the first two of these acts, but only such as "would be appropriate for the first of these offenses alone." The court's decree was that "the defendant, Sherman K. Levine is found guilty of contempt of court on November 30, 1951 and is directed to pay the sum of one hundred dollars for the use of the County and the costs."

From that decree and sentence the District Attorney appealed to the Superior Court which, being divided on the question of the proper disposition of the appeal and there being no majority of the court concurring on any issue which would result in a final decision, affirmed the decree and sentence. We, thereupon granted the District Attorney's petition for an appeal to this court.

Generally speaking, one is guilty of contempt when his conduct tends to bring the authority and administration of the law into disrespect. The right to punish for such contempt is inherent in all courts. When it is committed in its presence the court may, in punishing the offender, act of its own knowledge without further process, proof, or examination. Such power, "although arbitrary in its nature and liable to abuse, is absolutely essential to the protection of the courts in the discharge of their functions": *Ex Parte Terry*, 128 U. S. 289, 313. It is a power "essential to preserve their authority and to prevent the administration of justice from falling into disrepute": *Fisher v. Pace*, 336 U. S. 155, 159. The Act of June 16, 1836, P. L. 784, §23, recognizes "the power of the several courts of this commonwealth . . . to inflict summary punishments for contempts of court" in cases, inter alia, of "the misbehavior of any person in the presence of the court, thereby obstructing the administration of justice."

Judge BRAHAM was justified in refusing to disqualify himself and to assign another judge for the hearing. It is true that he *might* have done this, and there are cases in which such a course has been recommended by our appellate courts: *Snyder's Case*, 301 Pa. 276, 289, 152 A. 33, 37; *Commonwealth v. Sheasley*, 102 Pa. Superior Ct. 384, 391, 157 A. 27, 29, 30. See also *Cooke v. United States*, 267 U. S. 517, 539. In each

of those instances, however, there had been acrimonious feelings between the judge and the offender, whereas here there is nothing to indicate the existence, prior to this occurrence, of any strained relations. That a judge is not disqualified in contempt proceedings by the fact that the contempt was committed against himself is in accord with the almost unbroken current of authorities cited in 52 A.L.R. 1291; see also *Blodgett v. Superior Court of Santa Barbara County,* 210 Cal. 1, 290 P. 293, where the subject is discussed at some length. Nor is there any merit in appellant's contention that, while Judge BRAHAM might have taken immediate action when the contempt occurred on November 30, he lost the right to proceed by delaying for three days to issue the rule to show cause, in conducting the hearing two weeks later, and in not entering a final adjudication and decree until January 23, 1952. It is always within the discretion of the court whether to take action at once, based upon the judge's own knowledge of the facts, or to postpone action in order to take testimony and give the offender the opportunity to make a defense: *Ex Parte Terry,* 128 U. S. 289, 311, 313; *United States v. Sacher,* 182 F. 2d 416; *Sacher v. United States,* 343 U. S. 1. In the latter case there was a delay in the finding of contempt and the imposition of punishment for a period of more than eight months after the first act of misconduct had taken place and ten days after the most recent. But the Supreme Court of the United States pointed out (pp. 9, 10) that the term *"summary"* does not relate to the timing of the action but to a procedure which dispenses with the formality and delay that would result from the issuance of process and the holding of hearings, and that "If the conduct of these lawyers warranted immediate summary punishment . . . no possible prejudice to them can result from delaying it until the end

of the trial if the circumstances permit such delay." In the present instance Judge BRAHAM was well justified, and indeed acted wisely, in choosing to afford a hearing to the District Attorney instead of acting impulsively when his natural feelings of indignation might have overcome the requisite judicial poise and calm.

Passing these general observations, we come now to consider the merits of Judge BRAHAM'S conclusions based upon his findings of fact, having in mind what was said by Judge KELLER *In re Adjudication of Contempt of Myers and Brei,* 83 Pa. Superior Ct. 383, 387: ". . . as a general rule,—as in cases where the contempt arises from some misconduct committed in the presence of the court, . . . the appellate court will not inquire further than to ascertain whether the record shows such misconduct . . ., and its judgment on the facts is generally conclusive: . . . The question whether the alleged offender really committed the act charged will be conclusively determined by the order or judgment of the court, . . . ." See also *Commonwealth v. Newton,* 1 Grant 453, 454. Of course, as Judge KELLER further said: ". . . this rule is . . . subject to the qualification that the conduct charged as constituting the contempt must be such that some degree of delinquency or misbehavior can be predicated of it; for if the act be plainly indifferent or meritorious, or if it be only the assertion of the undoubted right of the party, it will not become a criminal contempt by being adjudged to be so."

We agree with Judge BRAHAM that the District Attorney was guilty of a public insult to the court in making the statement: "That's the way with this court, always mixing things up; everthing is set for one day."[1]

---

[1] We are not prepared to say that, in the further colloquy in which the court stated that "The people of this county are paying

This was equivalent to a public assertion that the court was incompetent in the arrangement of its business,—not merely on that particular occasion but "always". Certainly a remark of that kind was calculated to belittle the court in the eyes of the persons in the courtroom, and thereby to impair its dignity and authority. It must be remembered that those present were undoubtedly aware of the fact that the court had sent for the District Attorney and was awaiting his attendance. When he entered, instead of courteously explaining his failure to appear sooner, he openly and offensively belabored the court. There is pertinent here what was said in *Fisher v. Pace,* 336 U. S. 155, 161: "In a case of this type the transcript of the record cannot convey to us the complete picture of the courtroom scene. It does not depict such elements of misbehavior as expression, manner of speaking, bearing, and attitude of the petitioner. Reliance must be placed upon the fairness and objectivity of the presiding judge. The occurrence must be viewed as a unit in order to appraise properly the misconduct, and the relationship of the petitioner as an officer of the court must not be lost sight of." Even after he had had time to think the matter over more calmly the District Attorney added to his original offense by contumaciously refusing to apologize or in any way atone for his behavior. It need scarcely be said that it is the duty of a lawyer to maintain toward the courts a respectful and courteous attitude, not for the sake of the temporary incumbent of the judicial office, but for the maintenance of

---

for two district attorneys. They are entitled to have one in each courtroom.", the reply of the District Attorney that "The people of this county are getting their money's worth from the District Attorney's office." was contemptuous. We think that the District Attorney was not unjustified in thus defending his office from the implied criticism directed against it by the court.

its supreme importance: Canon 1 of the American Bar Association Code of Professional Ethics. As Mr. Justice MITCHELL said in *Scouten's Appeal,* 186 Pa. 270, 279, 40 A. 481: "... discipline and self-restraint [on the part of counsel] are as necessary to the orderly administration of justice as they are to the effectiveness of an army." It is a vital duty of every attorney, as an officer of the court, to uphold its honor and integrity.

We are not in accord with the President Judge's conclusion that the District Attorney was in contempt merely because both he and his Assistant were engaged in the performance of their duties in the one courtroom instead of providing a district attorney for the work also in the other, there being nothing in the record to indicate that he had been previously instructed in regard to the arrangement of the court's business for that particular day or that he deliberately intended to refuse assistance to the work in Judge BRAHAM'S court. It is true, as Judge BRAHAM states, that it is the function, not of the District Attorney, but of the court to arrange its business,—a duty which devolves upon the President Judge, who, of course, should always consult his colleagues for that purpose and have regard for their own plans and suggestions. Here it does not appear that the District Attorney intended to deny such power to the President Judge, or that, during the two years he had been in office, there had ever been any occasion to rebuke him in that respect or to admonish him as to the limits of his authority. Concerning his failure to come promptly, or to send his Assistant, into Judge BRAHAM'S room when he was summoned, regard must be had to the fact that there were many cases then being disposed of in Judge LAMOREE'S room in which lawyers, defendants, witnesses, and other persons were involved and in which he and his Assistant

were busily engaged, thus creating for him somewhat of an emergency situation. Undoubtedly it would have been better judgment on his part to have explained to Judge LAMOREE that he was being called by Judge BRAHAM[2] and to request, therefore, that he be allowed to leave; it would also have been more mannerly on his part to have visited Judge BRAHAM personally rather than return curt replies by the messengers, to have expressed his regrets to him, and to have asked him for instructions under the circumstances. However, his failure to do these things would seem rather to indicate a lack of tact than a deliberate intent on his part to flout the authority of the President Judge. On the whole, therefore, we absolve the District Attorney from a judgment of contempt on the basis of this particular charge, and we note incidentally that Judge BRAHAM did not allow it to weigh in the imposition of the sentence.

As far as the District Attorney's letter of December 4 is concerned, disrespectful and ill-advised though it was, the court did not take it into consideration in imposing sentence. It was certainly highly insulting to express to Judge BRAHAM a "belief" that his action in proceeding against the District Attorney was motivated by the fact that his "conduct in certain matters" was then under investigation by the District Attorney's office; indeed nothing could be more reprehensible than the making of such an ill-founded and offensive charge. It appears that the "investigation" in question arose from the fact that Judge BRAHAM was the Vice President of an organization the purpose of which was to preserve for the public some of the more beautiful sections of the county and to that end to have the County

---

[2] On the other hand, it might possibly have been better if Judge BRAHAM had communicated directly with Judge LAMOREE, requesting the release of the District Attorney or his Assistant.

Commissioners condemn those places for a public park; if such an "investigation" by the District Attorney was under way Judge BRAHAM had not been aware of it. The District Attorney's subsequent statement that he had not intended his letter as a "threat" would scarcely explain away so inexcusable an affront.

We affirm the decree of the court below insofar as it adjudged defendant guilty of contempt of court and imposed sentence for his public denunciation of it on November 30, 1951. Defendant to pay the costs.

Mr. Justice BELL and Mr. Justice CHIDSEY concurred in the result.

———

DISSENTING OPINION BY MR. JUSTICE JONES:

There are few offenses more odious than contempt of court. And, that is all the truer when the offender is a member of the bar whose sworn obligation specifically embraces the duty of conducting himself at all times with fidelity to the court. For the immediate and efficient redress of a contempt committed in the presence of the court, courts generally possess the inherent power to punish summarily for it. No one will gainsay that. See *Fisher v. Pace,* 336 U. S. 155, 159, and *Ex parte Terry,* 128 U. S. 289, 313. But, just as a court's power in such respect is great, so also is its responsibility for a proper exercise of the power commensurately heavy. And, as a contempt by an attorney is relatively more culpable than that of a layman, so also is equal punishment, when meted out to an attorney for contempt, proportionately the more severe. The judgment of guilt stands against him as a proven violation of his oath. It is of highest importance, therefore, that a case such as this be scrutinized with special care in order that injustice be not done. That, I fear, the majority of this court has inadvertently failed to do.

From my reading of the record in this case, I am persuaded that the court below erred grievously in making a contempt proceeding out of the matter involved and in summarily adjudging the respondent guilty. In my opinion, Judge BRAHAM acted both captiously and ill-advisedly. The litigation which he initiated is now before us for review. I have, therefore, no alternative but to express my differing views. The principle involved is of highest importance. A conscience-free and judicially untrammeled bar is as essential to the proper functioning of our judicial system as are judges themselves. The issue far transcends the personalities of the parties immediately concerned.

I am in accord with the majority of the Superior Court (which had original jurisdiction of the appeal in this case) whose opinion was that the judgment of contempt was error and should be reversed. The order of affirmance entered by that court was not on the merits but merely *pro forma* in the circumstances. The majority for reversal was split as to whether the judgment should be reversed and the appellant discharged or reversed with a remand for trial of the issue before another judge. As the majority of the Superior Court was unable to agree upon the form of the reversal, a definitive order on the merits was impossible, hence, the affirmance. It is clear, however, that not more than three of the judges of the Superior Court could have been for affirmance while at least four were of the opinion that the judgment of contempt was erroneous: see *Levine Appeal,* 170 Pa. Superior Ct. 579, 582, 88 A. 2d 104. Thus, it is readily apparent that opinion among the appellate judges of this State as to whether Judge BRAHAM acted properly in the premises is little better than evenly divided.

The record shows that President Judge BRAHAM, of the Courts of Lawrence County, entered a rule on the

district attorney of the County, Sherman K. Levine, calling upon him to show cause why he should not be adjudged in contempt for his conduct during a session of Quarter Sessions Court in Judge BRAHAM's Court Room (No. 1) on Friday, November 30, 1951. A recital of the facts, according to the Judge's version, was appended to the rule in the nature of specifications. The gist of the complaint was that, while both the district attorney and his assistant were in attendance upon a session of criminal court in Court Room No. 2 before the additional law judge, HONORABLE JOHN G. LAMOREE, Judge BRAHAM sent word by messenger to the district attorney requesting him to have a district attorney attend in his Court Room No. 1; that the district attorney twice refused to come upon requests by messengers from Judge BRAHAM; and that, when he did come into Judge BRAHAM's Court Room later and was "asked in open court by the President Judge why he had not provided a district attorney for Court Room Number One he broke into a rude and insolent denunciation of the court." What the district attorney was supposed to have said was not specified.

The district attorney filed a responsive answer disclaiming any contemptuous conduct on his part and explaining that both he and his assistant were busily engaged at a scheduled session of criminal court before Judge LAMOREE in Court Room No. 2 when Judge BRAHAM sent for him; that he told the messenger on each occasion to tell Judge BRAHAM that he was then occupied in Court Room No. 2 and would come to Court Room No. 1 as soon as he was free; and that, upon entering Judge BRAHAM's Court Room a little later, he was accosted by the Judge who charged him with defrauding the taxpayers by failing to have a district attorney in each court room. To that, the District Attorney replied that the taxpayers were receiving dollar

for dollar value for the money spent for his office. *Nothing was said by the Judge at that time about any contempt having been committed* and the matter was not pursued further.

Three days later, Monday, December 3rd, Judge BRAHAM called the district attorney into his chambers and there addressed him in manner as follows which was taken down stenographically and transcribed and a copy of the statement given to the district attorney at his request:

"December 3, 1951

"Mr. Levine, good morning.

"I have something to say to you about your conduct in Court last Friday, November 30, 1951.

"I did not trust myself to act justly on Friday. I was too much hurt. I had too much feeling about injustice and was too angry. Since that time the matter has been considered very carefully from all aspects.

"I have taken counsel. I have come with great reluctance to the conclusion that you must be cited for contempt of Court. The specifications have been prepared by me and will be typed today. Because of your insolent talk and attitude in Court on Friday, when you finally deigned to come into Court Room No. 1, it would seem that you would admit of no wrong or mistake in your treatment of the Court. You have not tendered to me one word of explanation or regret or of apology. This may mean that you desire to controvert the matter. A rule to show cause why you should not be found guilty of contempt of Court, is the appropriate way to decide the issue.

"I am, however, going to give you one alternative. I shall fix a time in Court to administer to you some words of public instruction, warning and of reproof. If you are willing to accept this public reproof, this

will be your only punishment. If you are not willing and decide to controvert the matter, I will fix a time and try you for contempt of Court.

"This, Mr. Levine is done with great regret. There are behind us many years of what I thought was friendly intercourse between us. I had thought that we were comrades in office, as well as, personal friends. You have done good work in your office as District Attorney. You have loyally supported this Court in a number of cases. It is a matter of great regret to me to be obliged to take this step. However, I am charged with preserving the dignity and authority of the Courts of Lawrence County of which at the moment, I happen to be the President Judge.

"I hate to subject the dignity of this Court and the good name of one of the officers of the County to the indignity of the proceeding for contempt of Court, however, it must be done.

"Accordingly, I shall allow you until tomorrow morning at 9:00 to indicate whether you are satisfied that there is enough for you to controvert to require me to try you for contempt of Court. If at that time you indicate that you are willing to accept the public reproof by the Court, I will fix a time. It will be my preference to do it immediately, but I am aware that you are concerned with your Grand Jury.

"If you are not willing to accept this public reproof, instruction and warning, a time will be fixed for trying you for contempt of court.

"Good Morning, Mr. Levine."

Shortly before nine o'clock the next morning (December 4th), the district attorney delivered to Judge BRAHAM his answer by letter whereof the following is a copy:

"HONORABLE W. WALTER BRAHAM,

"President Judge of Lawrence County,

"Court House,

"New Castle, Pennsylvania

"Dear Sir:

"This will acknowledge receipt of your communication dated December 3, 1951, which you directed the Court Stenographer to deliver to me.

"You accuse me of insolent talk and attitude before you in court room #1 on Friday, November 30, 1951.

"My first feeling is one of amazement. In all my years of practice I have always been respectful to all courts.

"You say I have not tendered you a word of explanation or regret or of apology. My conduct has always been and on Friday morning was such as required no explanation or apology. At that time I informed the Court that I was unable to conduct hearings in court room #1 because I was, and had been all morning, busily engaged with hearings in court room #2.

"Your letter states an alternative to which I cannot submit. In justice to myself I cannot possibly permit of any public instruction, warning or reproof.

"Your statements regarding the friendly relations between us are insincere and do not impress me. I believe the fact that your conduct in certain matters is now under investigation by my office had no little to do in motivating your present action.

"While my conduct was not improper in any manner, should you desire to controvert the matter, the facts should be determined in a fair and impartial hearing, where we may both be examined under oath and the facts determined by the HONORABLE JOHN G. LAMOREE, the other Judge of Lawrence County.

"Very truly yours,

Sherman K. Levine"

Later the same day (December 4, 1951), the Judge entered the rule on the district attorney to show cause why he should not be adjudged guilty of contempt, with the specifications appended, as already mentioned. Following the filing of the district attorney's responsive answer to the rule, the Judge set the matter down for a hearing before himself on December 17, 1951.

At the hearing on December 17th, counsel for the district attorney at the outset filed a suggestion that Judge BRAHAM was disqualified to sit in the matter for either of two specified reasons, (1) because of "personal feeling that does not make for a calm, judicial consideration and conclusion" and (2) because the citation and answer disclose the presence of issues of fact "which can best be determined by an impartial judge." Following a statement by Judge BRAHAM, he declined to disqualify himself. Respondent's counsel at once renewed their suggestion of disqualification for the additional reason that "the lengthy statement and argument just made" by the Judge gave further indication why he should not sit in judgment on the case. As evidence of his avowed personal detachment, Judge BRAHAM retorted that the charge was that the Court of Quarter Sessions, and not he, had been contemned. Counsel then pointed out that there were two judges of the district, both equally qualified to sit in Quarter Sessions, and that therefore the case should be set for trial before the additional law judge. But, Judge BRAHAM persisted in his refusal to disqualify himself and began the taking of testimony. He called six witnesses in chief, all of whom he interrogated in direct examination, and he cross-examined the respondent's witnesses, of whom there were eleven including the district attorney whom he cross-examined at length.

On January 23, 1952, more than five weeks after the hearing and almost nine weeks after the alleged

contempt, Judge BRAHAM handed down a lengthy, controversial and self-serving adjudication on the basis of which he found the district attorney guilty of three specific "acts of contempt" as follows: "first, defendant's insulting and contemptuous denunciation of the President Judge in open court on November 30 for fixing cases contrary to the wishes of the District Attorney; second, his failure, upon reasonable request, to provide the assistance of a district attorney for the court in Court Room Number 1 on the same day; third, the writing of the insulting letter of December 4."

For the contempt so found, the Judge sentenced the respondent to pay one hundred dollars for the use of the County and the costs. He specifically limited the sentence to the first two of the three acts of contempt above-quoted and expressly did not impose sentence for the district attorney's letter of December 4th *"because it was not charged in the specifications"* (Emphasis supplied). The reason here assigned is interesting in light of the fact that the affirmance by this court of the judgment of contempt is solely for language attributed to the district attorney by Judge BRAHAM in his adjudication, *which was not charged in the specifications and was not testified to at the hearing by any witness.*

Of the *three* overt acts found by the court below, as above stated, this court rejects *two* as not amounting to contempt, namely, (1) the district attorney's failure to go at once to Judge BRAHAM's Court Room in response to his request by messenger,[1] and (2) the district

---

[1] At no time did Judge BRAHAM communicate to Judge LAMOREE (the additional law judge) his desire that a district attorney be released for service in Court Room No. 1 which, as the opinion for the majority of this court recognizes, would have been the better course for Judge BRAHAM to have pursued.

attorney's letter of December 4th. With those conclusions, I fully agree.

That brings us, then, to the *one* count in Judge BRAHAM's adjudication of contempt which this court affirms, namely, that when the district attorney came into Judge BRAHAM's Court Room, he announced in a rude and insolent manner in the presence and hearing of the court and of the persons then assembled in the court room,—"That's the way with this court, always mixing things up; everything is set for one day." The only other place where this language appeared was in Judge BRAHAM's lengthy and argumentative response at the hearing on December 17th to the challenge by respondent's counsel of his qualifications to hear and determine the issue. For weeks, the specific language ultimately charged, and now made exclusively operative, resided alone in the Judge's memory, undisclosed to anyone.

But, just how well did Judge BRAHAM hear at the time of the November 30th episode? And, how disinterestedly did he remember what was said? By his own transcribed statement to the district attorney on Monday, December 3rd, he confessed to having been "too angry" the preceding Friday "to act justly" in respect of the alleged conduct of the district attorney in court that day. At the hearing two weeks later (December 17th) when the court crier was asked,— "Was the Court visibly angry", Judge BRAHAM interjected, "I would say so." The probative value of facts based upon recollection may be impaired for a number of reasons other than a want of veracity in the recollector,—a condition which I do not attribute to Judge BRAHAM. But, it is a matter of every-day knowledge that anger can, and often does, prevent the faithful recording of mental impressions of surroundings and attendant occurrences. It may preclude memory's ac-

curate recital of what actually took place or even of the correct sequence of events. And, it is admitted all around that no record was made of what took place when the district attorney came to Court Room No. 1 on November 30th.

The language which Judge BRAHAM ultimately found the district attorney guilty of uttering was not contained in his statement to the district attorney of December 3rd; it was not charged in the specifications which he filed in support of his citation of the district attorney for contempt; and no one testified to it at the hearing. And, although the district attorney literally begged Judge BRAHAM to tell him what he had said that was contemptuous, the Judge failed to enlighten him. The following colloquy taken from the Judge's extensive cross-examination of the district attorney at the hearing is illuminating: By Judge BRAHAM: "Let me ask one question about Monday, December 3rd, when you say I dictated this statement which you presented. Isn't all you said, Mr. Levine, 'may I have a copy of that statement'? and didn't I say, 'yes'." By Mr. Levine: "I did say that and I also said to you, Judge, 'what did I say, have you a record of what I have said, I cannot remember anything, of saying anything that was contemptuous or insolent', and you says, 'good morning, get out of here, I don't want to argue with you'." By Judge BRAHAM: "And I asked you, you're right about whether there was a record made of what was said in court, and I asked Mr. Binder [the court reporter] whether he had any record and he said he didn't, isn't that correct?" By Mr. Levine: "That is correct, and then you said, 'I do not want to argue the question with you, Mr. Levine, get out'." By Judge BRAHAM: "I think, Mr. Levine, your memory is in error on that, 'get out', I said, 'good morning,' didn't I?" By Mr. Levine: "You also said, 'get out'." By

Judge Braham: "Let me ask you one question about this. Do you say that on the occasion here in court, which was I believe, Tuesday, December 4th, I said to you that your conduct in court didn't amount—had not amounted to contempt?" By Mr. Levine: "That is what you said, Judge, in the presence of myself, Mr. Binder, Mr. Powers, and Mr. Klebe." The import of the foregoing, in its unrefuted implications of issues of material fact, is self-evident.

Nor did Judge Braham at the hearing rely on his own memory of what the district attorney had said in Court Room No. 1 on November 30th. He offered the testimony of the court crier, Mr. Vance, on that point; and he later found in his adjudication that "The evidence of the Court Crier [Mr. Vance] corroborates the President Judge [Braham] as to the statements made." It does nothing of the sort. What the court crier testified to in material connection under questioning by Judge Braham was,—"Q. . . . Could you tell us what was said when Mr. Levine finally came into court?" By Mr. Vance: "Well, he came in and as I recall, the Court, meaning Judge Braham, accosted [sic] as to why he had failed to respond to the summons that morning to appear in court room no. 1." Q. "What did he say?" A. "Well, I believe it was a repetition of what he had told me, that they were too busy and that the —it wasn't the District Attorney's fault that the court calendar had been loaded down." The difference in the respective versions of the Judge and his witness is material and, at least, calls for reconcilement which is a task for a disinterested fact-finder.

The case had long since ceased to be one for summary punishment when the court acted upon it. (1) Because of the period of time permitted to elapse, without action, the court forfeited its right to punish summarily for the alleged contempt. (2) The court re-

sorted to a rule to show cause and a hearing and did not purport to be proceeding summarily. (3) By reason of the Judge's self-interest and evident bias, he was disqualified to conduct the hearing and to adjudge the material issues of fact as to which he was a witness. Finally, (4) the hearing lacked the requisites of due process.

(1) The justification for the inherent power of courts to punish summarily for a contempt committed in the face of the court lies in the need for prompt and effective enforcement of obedience and order "essential to preserve their authority and to prevent the administration of justice from falling into disrepute": *Fisher v. Pace,* supra. While the term, "summary", as used in relation to the punishment of a direct contempt, has reference to the type of proceeding rather than to the timing of the action (*Sacher v. United States,* 343 U. S. 1, 9), it is implicit in the rationale of a summary proceeding that it be initiated and followed through timely. In *Ex parte Terry,* supra, Mr. Justice HARLAN stated the rule to be that ". . . for direct contempts committed in the face of the court, . . . the offender may, in its discretion, be *instantly* apprehended and *immediately* imprisoned, without trial or issue, and without other proof than its actual knowledge of what occurred . . ." (Emphasis supplied). The exigencies of the occasion may, in certain circumstances, require that the adjudication and punishment be temporarily postponed (see *Sacher v. United States,* infra). But, the instant case presented no such situation.

In *In Re Foote,* 76 Cal. 543, 18 P. 678, the Supreme Court of California long ago observed that,—"Admitting that petitioner was guilty of contempt, committed in the presence of the court, it appears that no proceedings were taken by the court at the time the contempt was committed to punish the petitioner; nor were there

any steps taken to retain jurisdiction until 50 days thereafter, when the order, adjudging him guilty of contempt, and imposing a fine of $300, was made without notice of any kind. Under these circumstances, we think the court lost jurisdiction to proceed against petitioner for contempt, and that the order and commitment are void." Obviously, the foregoing was said with reference to a summary proceeding. In *People v. Burt*, 257 Ill. App. 60, 63, the Appellate Court of Illinois for the 2nd Division said "No one would question the right of the court to have proceeded as in the case of direct contempt at the time of the commission of [the contemnor's] acts when she was still in the court's presence, or had such proceedings been then instituted and continued until the time of the court's action. Neither of these proceedings was taken." Accordingly, the court held (p. 64),—"But whatever authority the court might have exercised at the time of the commission of said acts to take jurisdiction of her person and proceed as in a case of direct contempt committed in its presence, it had no right to assume jurisdiction of her person for such purpose [later] without any judicial process whereby it could be acquired. The mere fact that she was then brought into the presence of the court on the other criminal cases did not authorize assumption of such jurisdiction. One cannot be deprived of his liberty in this country without due process of law."

The case of *Sacher v. United States*, 343 U. S. 1, which the majority opinion cites, does not derogate from the foregoing principle. What the *Sacher* case holds is that, in order that the progress of a criminal trial be not unduly interrupted or interfered with by a temporary suspension for the court's interposition of a summary proceeding against a defendant or his counsel for the punishment of a direct contempt cur-

rently committed by them, the trial court is warranted in postponing the summary proceeding for the contempt until the jury's verdict in the matter on trial has been rendered. Mr. Justice JACKSON, speaking for the majority of the court, said (p. 11),—"We hold that Rule 42 [Fed. Rules Crim. Proc.] allows the trial judge, upon the occurrence in his presence of a contempt, immediately and summarily to punish it, if, in his opinion, delay will prejudice the trial. We hold, on the other hand, that if he believes the exigencies of the trial require that he defer judgment until its completion he may do so without extinguishing his power." In the *Sacher* case, the trial judge merely awaited completion of the trial before sentencing defendants' counsel for the contempts committed during the course of the trial. He acted at the earliest available moment, viz., immediately upon receiving the jury's verdict in the matter on trial. No such exigency existed in the instant case. Moreover, unlike here, all of the contempts cited and found in the *Sacher* case were matters of undisputed court record.

Admittedly no record was made of what was said by the district attorney in Judge BRAHAM'S court room on November 30th. Nor did the Judge take any action then to punish the district attorney for any contempt; indeed, so far as the record discloses, the word contempt was not even mentioned in the court room that day. No pending trial prevented the court from acting in the matter. The court adjourned for the day at twelve noon. And the Judge made no move to retain jurisdiction that he might proceed summarily against the district attorney later. The only reason which the Judge gave for not having acted summarily on November 30th was that he was "too angry" and couldn't trust himself to act justly in the matter at the time. Certainly, that condition was incapable of

continuing into the indefinite future the court's power to proceed summarily. Three days later, the Judge called the district attorney into his chambers and, then, for the first time made known to him his intention to cite the district attorney for contempt unless the latter voluntarily submitted to a rebuke by the Judge in open court which the district attorney refused to do. Justifying the action of the court below, as does the majority of this court, on the basis of the *Sacher* case mistakenly extends, in my opinion, the ruling of that case far beyond its intended scope. The implied effect of this court's present holding is that a judge can, at practically any time that suits his convenience or whim, take up for summary punishment an alleged direct contempt said to have been committed at some prior time and, that, without having contemporaneously declared the alleged contempt or having acted to retain jurisdiction to deal summarily with it later.

(2) The court below, apparently recognizing the inappropriateness of belatedly proceeding summarily, entered the rule on the respondent with specified charges and fixed a hearing thereon. But, the court nonetheless summarily adjudged the respondent guilty by acting upon its own independent recollection of what had occurred in Court Room No. 1 on November 30th without any testimony to support the language that the court ultimately imputed to the district attorney. Certainly, a hearing and not a summary proceeding must have been contemplated. In Judge BRAHAM'S statement to the district attorney on December 3rd, he announced,—"I will fix a time and try you for contempt of court" (see statement ante). Again, in the statement which he made at the outset of the hearing on December 17th, he conceded the existence of an issue as to a material fact which, admittedly, had not occurred in his presence and which, therefore, required a hear-

ing for its determination. Thus, he then stated,—"I could not have determined that question summarily here in open court on November 30 because I didn't know whether my messages to the District Attorney in court room No. 2 were delivered." The necessity for a hearing was manifest. But, the hearing which the Judge conducted proved to be illusory. Summary procedure not having been availed of, it was not permissible for the Judge to make findings from his own memory, unsupported by any testimony adduced at the hearing. It is therein that the fundamental error of this court's affirmance also lies. The majority mistakenly attribute to a judge, upon the *trial* of a contempt, the right, which attends only a summary proceeding, to act upon his own recollection without testimony. The majority opinion fails to recognize that where "the issuance of process and the holding of hearings" is resorted to, the incidents of a summary proceeding do not attend. It follows, therefore, that the language, for which alone this court affirms the judgment of contempt, should have been charged openly and timely against the respondent and proven at the hearing like any other material fact.

Actually, the hearing turned out to be but a medium for the Judge's expounding his prerogative as President Judge "to assign cases" for trial. Indeed, he deemed that to be "the principal issue". At the beginning of the hearing on December 17th, the Judge said,—"There are two or three issues which I invite you [sic] gentlemen's attention. First, is the contempt in open court. I might have imposed sentence on that day, but I was too angry. Then it turns out that there is involved this larger question; whether I, as President Judge, have the right to determine that there shall be a session of Quarter Sessions in this court room, contemporaneously with a session in court room No. 2. I

say, the power to decide that point rests with the Court. That seems to be *the principal issue,* and it's a question of law" (Emphasis supplied). The first three of the six conclusions of law contained in the adjudication of January 23rd show how far afield from the contempt charge the proceeding digressed, *vide*: "1. The court and not the district attorney has the power to fix sessions of court. 2. The court and not the district attorney has the ultimate power to assign cases. 3. A president judge has no more power than an additional law judge except that he has the duty of assigning cases and determining the priority of business." As to the sentence imposed on the respondent, the adjudication states,—". . . this sentence is intended to demonstrate that the court and not the District Attorney has the power to fix sessions of the court and the ultimate power to assign cases . . . . The District Attorney continues . . . to demand them for himself." Even if he did, there was a more appropriate way for the court to settle that with dignity and effect. A contempt proceeding, especially one summarily conducted, should not be used to vent a judge's anger or to placate his ruffled vanity over a supposed invasion of the prerogatives of his office.

The integrity of the proceeding as a means for redressing the alleged contempt is impugned by the adjudication wherein the Judge states,—"Three days went by. He [the district attorney] offered no word of explanation, or regret or of apology. The President Judge could only conclude that the District Attorney had not only run the courts on November 30 but intended to keep on running them. When the President Judge challenged this fatuous idea by his statement of December 3 the District Attorney responded with the letter [of December 4th] quoted in the 21st finding of fact." Is it not a legitimate inference from the foregoing that

the Judge resorted to the contempt proceeding to chastise and discipline the district attorney not for anything that he had said in Court Room No. 1 on November 30th but for having devoted his own and his assistant's services that morning to the disposition of criminal cases before Judge LAMOREE in Court Room No. 2.

(3) Because of Judge BRAHAM's self-interest and personal feeling, he should have disqualified himself for the hearing of the contempt charge against the district attorney. The desirability and propriety of that course in circumstances such as here obtained has been judicially recognized and confirmed: see *Cooke v. United States,* 267 U. S. 517, 539; *Snyder's Case,* 301 Pa. 276, 289, 152 A. 33; and *Commonwealth v. Sheasley,* 102 Pa. Superior Ct. 384, 391. The majority seek to distinguish the cases, just cited, from the present on the ground that, in those cases, "there had been acrimonious feelings between the judge and the offender, whereas here there is nothing to indicate the existence, prior to this occurrence, of any strained relations." By the time of the presently pertinent "occurrence", viz., December 17th, when the Judge refused to disqualify himself, there had been two and a half weeks of extremely "strained relations". The record fairly exudes personal feeling and pique on the part of the Judge. A few illustrations should suffice. In the adjudication which the Judge handed down after seven intervening weeks in which to "cool off", he states, in reference to a portion of the district attorney's letter of December 4th to which he particularly objected,[2]—

---

[2] The letter was a direct and factual response to the Judge's demand of the district attorney on December 3rd for a reply by 9 A.M. the following morning and contained an expression of the district attorney's surprise and dismay at the Judge's charges and a personal reference to the Judge. The letter was not exhibited by the district attorney in open court, or elsewhere, nor was it published by him.

"He [the district attorney] keeps a black book of complaints and when he thinks he has enough against the judge, he flouts and derides his authority and defies him to proceed. This is the District Attorney's version of 'The Terror'." Again, the adjudication queries and answers,—"Were an ordinary district attorney, well disposed toward all men, to learn that there was an apparent discrepancy between his plans and the plans of the President Judge, would he not at once have sought him out and endeavored to arrive at an understanding? This the District Attorney never did." The stultifying implication is plain. As already appears, he charged the district attorney with entertaining a "fatuous idea". He was especially aggravated by the district attorney's letter of December 4th, terming it "insulting" and finding it to be an act of contempt which it certainly was not, as this court correctly holds. There is every bit as much reason for disqualifying the Judge from conducting the hearing on the contempt charge in the instant case as there was in the cases above-cited.

As was said by Mr. Justice HOLMES,—"When it is considered how contrary it is to our practice and ways of thinking for the same person to be accuser and sole judge in a matter which, if he be sensitive, may involve strong personal feeling, I should expect the power to be limited by the necessities of the case 'to insure order and decorum in their presence' as stated in *Ex parte Robinson*, 19 Wall. 505." While the foregoing was said in a dissenting opinion (*Toledo Newspaper Company v. United States*, 247 U. S. 402, 423), its merit cannot be denied.

(4) A trial, rather than a summary proceeding, having been entered upon by the court below for the punishment of the alleged contempt, the respondent was entitled to be informed of the precise charge against

him and to an opportunity to be heard in answer thereto. Instead of that, he was found guilty of contempt for the utterance of language with which he was never charged and as to which no one testified at the hearing. The one thing whereof he was found guilty, which this court now sustains, proceeded alone from the memory of the trial judge. For that and other reasons hereinbefore given, the respondent was denied due process of law in violation of both Art. I, Sec. 9, of the Constitution of Pennsylvania and the Fourteenth Amendment of the Constitution of the United States.

I would accordingly reverse the judgment and discharge the respondent. The matter has gone too far and too long and too little remains for the case to be returned to the court below for trial before a disinterested and impartial judge. The episode has already been magnified out of all proportion to its original significance. The controversy between the Judge and the district attorney could no doubt have been resolved amicably long ago with a little more forebearance and cooperation on the part of both.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

A simple misunderstanding or even a slight neglect has been fanned by tempers into a legal controversy all out of proportion to the unsubstantial incident which gave it birth.

On November 30, 1951, President Judge BRAHAM of the Lawrence County Courts was presiding in Court Room No. 1, while Judge LAMOREE was presiding in Court Room No. 2. In accordance with arrangements concluded a week prior thereto, Court Room No. 2 had been designated as the sentencing court for that day, while preparations had been made that an elec-

tion dispute, two public assistance cases and the sentencing of two defendants were to be disposed of in Court Room No. 1.

It was the practice in Lawrence County, in the interests of orderly and expeditious procedure, where a large number of sentences were to be imposed on one particular day, for both the district attorney and the assistant district attorney to attend together in the sentencing court. The routine for a busy day, as this one promised to be, followed the usual procedure that while the district attorney or his assistant would be submitting one case to the Court, the other would be calling the next case, gathering witnesses, explaining to the defendants their right to have counsel and providing for volunteer lawyers where request was made, checking on past records, having guilty pleas signed, and so on. In many of the cases no grand jury indictments had yet been returned so that if the defendant in any instance pleaded guilty, the grand jury expense was saved to the county.

That this plan of operation was desirable and represented the wisdom of experience is evidenced by the fact that through its utilization on November 30, 1951, in Court Room No. 2, twenty-three cases were heard and disposed of. In addition, two applications for parole were entertained and the preliminaries for the fixing of a day of trial for a murder trial were attended to. Present in the operation of this court business that morning were two city police, three deputy sheriffs, one State policeman and eight attorneys.

While the district attorney Sherman K. Levine and his assistant, John S. Powers, were thus engaged in Court Room No. 2, Judge BRAHAM, at about 9:30 a.m. sent a messenger to that courtroom to ask Mr. Levine to report to Court Room No. 1. Mr. Levine replied, through the courier, that he was attending to

court business in No. 2 and would report to No. 1 as soon as he could get away. Judge BRAHAM repeated his request.

At about 10:15 or 10:30 Judge LAMOREE declared a recess in No. 2 and this allowed the District Attorney an opportunity to proceed to No. 1. Upon arrival there, an angry exchange immediately occurred between him and the Presiding Judge. Judge BRAHAM took amiss Mr. Levine's failure to respond promptly to his summons, and Mr. Levine took umbrage because of Judge BRAHAM's criticism, which, according to his view, was unwarranted since he was attending to the duties previously mapped out for him for that morning.

However, despite their respective high offices, both the Judge and the District Attorney, being susceptible to the same emotions which influence mankind everywhere, became offended. But then, on the other hand, since they were both highly intelligent men, they should have realized that any demonstration of wrath could not possibly undo what had already taken place and could only whip into flame the spark of momentary clash which would otherwise have died away in good-natured forbearance, of which quality both of these estimable personalities have enough to spare.

Judge BRAHAM felt that the dignity of his Court had been wounded and spoke sharply to the District Attorney. Mr. Levine concluded that the honor of his position as District Attorney had been attacked and he responded tartly. And the teapot prepared to receive its tempest.

No one had been harmed by the District Attorney's retarded arrival which, at the most, did not exceed an hour. When Mr. Levine failed to appear, Judge BRAHAM, with maximum good sense proceeded to attend to the matters before him without a district at-

torney. And then when both the District Attorney and the Assistant District Attorney arrived, the remaining business in Court Room No. 1 was disposed of with judicial dispatch. Thus, the sheer extravagance of the thunderous charges, counter-charges, criminations and recriminations which followed the lightening flash of acerbity between these two men is made gem-clear in the fact that all the business in Court Room No. 1 for the entire day was finished by noontime, (12:30 p.m.) and all the business in Court Room No. 2, with one slight exception, was terminated by noon. Even from Judge BRAHAM's point of view, no one was damaged, if, arguendo, Mr. Levine was tardy in presenting himself after being summoned to No. 1.

It cannot be gainsaid that Mr. Levine was attending to important functions of the office to which the people had elected him when the supposed contempt of court took place. Had Mr. Levine been absent from the courthouse, idly passing the time in places unknown, or immersed in private affairs, resentment on the part of Judge BRAHAM would have been warranted. But a fireman fighting a blaze, a policeman quelling a riot, a mailman delivering post, a doctor operating on a patient, or a judge charging a jury could not have been more meritoriously attending to his allotted task than was Mr. Levine when Judge BRAHAM sent the court crier to summon him.

Even if we assume that Mr. Levine could have been more tactful and circumspectious in the entire episode, I fail to see how he committed contempt of court because he did not *instanter* drop everything in Judge LAMOREE's court to hurry to Judge BRAHAM's court. Mr. Levine also owed a duty to Judge LAMOREE, who was in the midstream of doing his morning work too. According to Judge BRAHAM's reasoning, Judge LAMOREE would have been justified in holding Mr.

Levine for contempt of court if he had deserted Court Room No. 2. But is it fair that a District Attorney conscientiously attending to his duties should be thrown between Scylla and Charybdis?

It is important to note that Judge LAMOREE, a veteran jurist and a former district attorney of distinguished reputation, testified at the hearing before Judge BRAHAM that it was the practice for the district attorney and assistant district attorney to be in the sentencing court together on sentence day. He testified further that Mr. Levine had always been cooperative with the Court and that in his manner and conduct, Mr. Levine had always been "deferential with respect to the Court."

At the opening of the contempt hearing on December 17, 1951, Judge BRAHAM said: "The whole question is, who has the power and the authority to determine in how many of the Court rooms of this County, sessions of the Quarter Sessions of court may be heard at the same time. Does the Judge have the authority to settle that, or does the District Attorney?"

Did Judge BRAHAM need to conduct a contempt of court hearing in order to answer that question which answers itself? Of course, it is the Court that has the power and the authority to determine *all* matters pertaining to the conduct of the Court of Quarter Sessions. All that Judge BRAHAM, as president judge of Lawrence County, needed to do was to issue a Court order on the subject and that would have settled the question definitively and conclusively. The Court may naturally confer with the District Attorney in reaching its conclusion in matters of this kind, but it should not and cannot divide authority and responsibility.

At another place in the hearing Judge BRAHAM said that the whole issue revolved around this point, "and

it is a question of law." It certainly did not require 197 printed pages of testimony to decide that question of law.

The Majority Opinion says that it agrees with Judge BRAHAM that the District Attorney was guilty of a public insult to the Court in making the statement: "That's the way with this court, always mixing things up; everything is set for one day." But the record is barren as to any such language. And the transcript of testimony is equally empty of support for Judge BRAHAM'S statement that the District Attorney "broke into a rude and insolent denunciation of the Court."

Judge BRAHAM called six witnesses in behalf of his rule on the District Attorney to show cause why he should not be held in contempt of Court. Not one of these witnesses quoted the words or described the conduct which Judge BRAHAM ascribed to Mr. Levine. No one said that Mr. Levine was rude or insolent. One of the Judge's witnesses was Clifford L. Vance who has been a Court crier of the Courts of Lawrence County for sixteen years. He is the one who carried the message to Mr. Levine and was present when Mr. Levine reported in Court Room No. 1. He testified that when Mr. Levine appeared, it was Judge BRAHAM who spoke first, and the burden of the Court's remarks was that Mr. Levine should account "for his delinquency" in not responding to the request of Judge BRAHAM. The Judge said, according to Mr. Vance, that "the taxpayers were being defrauded" because both the District Attorney and the Assistant District Attorney were in Court Room No. 2.

To these strictures Mr. Levine replied that in his judgment "the tax payers were getting value received —dollar for dollar." Mr. Vance explained that in this colloquy both Judge BRAHAM and Mr. Levine were "visibly angry."

Upon this meager episode a towering pyramid of unpleasant and wholly unnecessary litigation has been constructed. The Majority Opinion assumes that despite the direct evidence to the contrary in the record, Judge BRAHAM'S conclusions must be affirmed because of his "findings." The "findings" were not made on the day of the alleged occurrence, so therefore do not have spontaneity to support them, and, furthermore, they have no substantiation from the testimony presented at the time the whole episode was exhaustively treated from the witness stand.

The case of *Schlesinger Petition,* 367 Pa. 476, decided by this Court recently is a decision in point. In that case the Trial Judge asked Attorney Schlesinger if it was true that he belonged to the Communist Party or any other organization committed to overthrowing the government of the United States by force and violence. This interrogation (done in the absence of the jury, parties and witnesses) was necessitated because in questioning the jurors on their voir dire Attorney Schlesinger had inquired as to whether they had been influenced by the "alleged political associations" of the attorney, those associations obviously referring to press notices regarding his alleged Communistic affiliations. It had been asserted publicly before a Congressional committee that this attorney had said: "While we have a strong Communist Party in New York City, I don't see how we can wage a successful revolution unless we build the party in Pittsburgh."

When the Trial Judge questioned Schlesinger about these reputed Communistic activities, Schlesinger launched into a verbal denunciation of the Judge, using contemptuous language and engaging in contemptuous conduct. The Trial Judge made findings of fact on the actions of Attorney Schlesinger and enumerated those findings as follows: That Attorney Schlesinger

"behaved in a disorderly, contemptuous and contumacious manner; that he made false statements to the Court; that he turned his back on the Court; that he contemptuously declared he would not listen to the Court; that he would not show respect to the Court; that he tried to leave the Court while the Judge was speaking; that he charged the Judge with having personal animosity and venom toward him and when called upon to submit reasons for such a statement refused to present any reasons: that he was 70 minutes late for the trial and then stated a falsehood for his tardiness; that he constantly interrupted the Court when the Court was speaking; that he refused to answer, without giving reasons for his refusal, questions which went to the very core of his fidelity to the Court and to his oath of office as an officer of the Court."

Later, while contempt proceedings against Schlesinger were pending, a deputy sheriff served on him a Court order issuing from the Court in which the asserted contempt had occurred. Schlesinger looked at the document and threw it into the refuse of the street.

The essentials of contempt are disobedience to the court or openly despising or opposing its authority or dignity. It may consist of evading or resisting the court's process, indulging in disorderly or insolent behavior or language in the actual presence of the court, using language which is reproachful or scornful, or which tends to lessen the authority of the court or the respect for it. (Contempt by Edward M. Dangel, National Lawyers' manual, p. 158.)

The Pennsylvania Act of 1836, P. L. 784, §23, 17 P.S. §2041, classifies contempts as follows: "The power of the several courts of this commonwealth to issue attachments and to inflict summary punishments for contempts of court shall be restricted to the following cases, to-wit: I. To the official misconduct of the

officers of such courts respectively; II. To disobedience or neglect by officers, parties, jurors or witnesses of or to the lawful process of the court; III. To the misbehavior of any person in the presence of the court, thereby obstructing the administration of justice."

Attorney Schlesinger's act of contempt on May 24, 1951, occurred in the presence of the Court. His opprobrious language, his walking out, his refusal to listen, his false charges of "entrapment," etc., all took place in the courtroom under the eye of the judge.

" 'When the contempt is committed in the presence of the court, and the court acts upon view and without trial and inflicts the punishment, there will be no charge, no plea, no issue and no trial; and the record that shows the punishment will also show the offence, and the fact that the court had found the party guilty of the contempt; on appeal to this court any fact found by the court below would be taken as true, and every intendment would be made in favor of the action of the court.' " (*Ex Parte Terry,* ibid, 308.)

Applying these standards of proof to the facts in the *Schlesinger* case, the Trial Judge found the lawyer guilty of contempt of court and ordered him committed to the Allegheny County Jail until he should purge himself of the contempt. He appealed to this Court and this Court not only exonerated him but severely criticized the Trial Judge, declaring that the Judge had no right to ask the lawyer, in spite of the state of the record, if the lawyer was a member of any organization committed to overthrowing the government by force and violence. This Court said further that Schlesinger was justified in treating the Trial Judge in the manner in which he did and that he was not guilty of any contempt of Court in throwing a Court order into the street since the Court order was ineffective.

In the case at bar, the Majority have declared that Sherman K. Levine did not commit any contempt when he failed to report to Judge BRAHAM, but committed contempt when he broke "into a rude and insolent denunciation of the court." Since there is nothing in the record to support the finding that Levine broke into a rude and insolent denunciation, this assumed happening can only be accepted as true because it was made a finding by Judge BRAHAM. But this Court ignored the finding of the Trial Judge in the *Schlesinger* case when the Trial Judge said that Schlesinger had turned his back on the Court, had interrupted the Court when the Court was speaking, stated he would not show any respect to the Court, and so on.

The majority here have found that Levine was free of contempt for failure to respond to Judge BRAHAM'S summons, but have found him guilty of contempt when he spoke to the Judge in the manner already discussed. How does that differ from the *Schlesinger* case? There, this Court held that the lawyer committed no contempt when he refused to answer the Judge's questions which put him, at that point, where Levine was when he came into Judge BRAHAM'S court. But whereas this Court found that Schlesinger was not guilty of contempt for acting contemptuously in the presence of the Court. it has found here that Levine was guilty of speaking contemptuously even though the remarks he made were only predicated upon his failure to arrive in Court Room No. 2 on time, which this Court holds does not constitute contempt.

The *Schlesinger* case and the *Levine* case cannot possibly stand together. Either the Supreme Court erred in the *Schlesinger* case or it has erred here.

If it is not contempt of Court when a lawyer flouts the authority of the Court to its face and casts away

as rubbish documents bearing the Court's seal, I fail to see how Mr. Levine's conduct can be considered contemptuous.

If, on November 30, 1951, Mr. Levine acted in the manner Judge BRAHAM said he did, it is strange that Judge BRAHAM did not find him guilty of contempt at that very moment. If the cloak of dignity was rent by conduct that was rude and insolent, the mending should have been accomplished at once. A reprimand from the bench would have been the catalytic, bringing order out of disorder, calm out of turbulence, respect out of assumed disrespect. Judge BRAHAM explained that he could not bring himself to doing this because he was too angry. He could not master the situation because he could not master himself, but it is possible that the delay increased rather than decreased the choler. Certainly it threw the picture out of focus and it could also have ruffled the pool of memory.

No one becomes bad in a day and certainly not in an hour or minute. Judge BRAHAM himself said that Mr. Levine had done "good work in his office as District Attorney." In his adjudication in this case he stated: "The District Attorney in his two years of office has performed much meritorious service." We have seen how Judge LAMOREE also spoke well of Mr. Levine. If Mr. Levine, therefore, was an efficient public servant, a good citizen and a reputable attorney during all his years at the bar and no one has suggested to the contrary, it is improbable that he could suddenly decide to become contemptuous of the very Court in which he must earn his living. On his past performance and his good conduct, a little patience on the part of the Court would have been in order and this unfortunate long, drawn-out controversy would never have taken place.

There is but one other matter to consider and that is the letter written by Mr. Levine to Judge BRAHAM. There is no doubt that this letter was ill-advised, but it does not seem that the letter which Judge BRAHAM wrote to Mr. Levine was the acme in advisability either. It began with a cheerful "Good Morning" and ended with an equally cheerful "Good Morning," but in between those "Good Mornings," there were sandwiched in many omens of a bad morning for Sherman K. Levine, the District Attorney of Lawrence County, Pennsylvania.

Although the majority of this Court has sustained the contempt findings, I believe there is still time for a genuine, cheerful "Good Morning" on the part of Judge BRAHAM by remitting the fine imposed on Mr. Levine.