## Commonwealth *ex rel.* Tyler *versus* Small.

| 26 | 31 |
|---|---|
| 190 | 184 |

The Supreme Court has jurisdiction of a question involving the *right* to a military office under the laws of this Commonwealth.

The action of a board of officers in deciding on a contested military election, is final and conclusive.

Such decision cannot be reviewed, altered, or set aside by the governor as commander-in-chief.

The writ of *quo warranto* is the proper remedy to try the right to a military office.

For the proceedings on attachment for contempt, see 2d opinion of Low-RIE, J.

THIS was a proceeding, by *quo warranto*, in the name of The Commonwealth *ex rel.* John Tyler, Jr., against William F. Small.

The suggestion filed set forth that, on the 5th day of June, 1854, an election was held in the Second Brigade of the First Divison Pennsylvania Volunteers, for brigadier-general of the brigade—that the return of the election stated that the majority of votes for brigadier-general had been given to William F. Small, and who was returned as elected.

The election was contested, and a board of officers, called by Major-General Patterson, consisting of himself, Brigadier-Generals Cadwalader and Reilly, who convened on the 20th July, 1854, and on the 26th December, 1854, made out a report, which was transmitted to the secretary of the Commonwealth on the 28th December, 1854, deciding that the election had been illegally conducted; and that the same be set aside, and a new election be held. The reasons stated by the board are as follows:—

"The commissions of some officers and muster rolls, furnished by officers claiming to command companies, were produced, many of which (if they ever had any legal existence) had not paraded for several years, and were not equipped for service as contemplated by law. The annual inspection and returns had not been regularly made, which increased the difficulty of ascertaining what companies composed the brigade.

"It must be apparent that under these circumstances, that in the disorganized condition of the brigade, an inspection should

[Commonwealth *ex rel.* Tyler *v.* Small.]

be made of each company, and the record of their existence established previously to a new election.

" At some of the polls voting by proxy was illegally permitted, and a few members allowed to vote for all the other names of members upon the muster roll of their companies, and there were cases where the whole number of votes polled clearly exceeded the number of members of the companies.

" The judges of the election in most cases were not even duly qualified, and the election was conducted in many of the essential requisites with great carelessness and want of observance of law."

On the 9th January, 1855, a new election was ordered by the brigade inspector of the brigade, to be held on the 22d of January, 1855, and on the 13th January, 1855, a similar order was issued by Major-General Patterson. On the 10th of January, 1855, Governor Bigler issued a special order to General Patterson, directing him to issue an order for a rigid inspection of the brigade prior to the election.

This latter order was countermanded and revoked by Governor Pollock on the 17th January, 1855, and General William F. Small directed to resume the command of the brigade, &c.

On the 22d of January, 1855, the election as previously ordered was held, and the relator John Tyler, Jr., returned as elected, and the return transmitted to the secretary of the Commonwealth.

On the 3d of February, 1855, by a special order issued, Governor Pollock set aside and reversed the decision of the board of officers, of the 26th December, 1854, setting aside the election of William F. Small for the following reasons:—

" That the board did not proceed and decide according to law in the premises."

" In not stating in which of the companies voting by proxy had been permitted, and how many illegal votes were given, and for whom, and whether such votes would have changed the result of the election."

" That the board erred in not stating in their report in which of the companies ' the judges of the election had not been duly qualified.' "

That the allegation in the report of the board that the brigade was disorganized, in consequence of the neglect of former officers to keep records, &c., did not prevent the volunteers from electing their officers, and did not show that the election was illegal.

That the decision of the board was not rendered in time.

The decision of the board was, therefore, directed to be reversed and annulled, and a commission directed to be issued to William F. Small, as Brigadier-General of the Second Brigade, and which was accordingly done—to date from the 5th day of June, 1854.

The suggestion of the relator suggested further that the said

[Commonwealth *ex rel.* Tyler *v.* Small.]

William F. Small has, since the 1st day of March, 1855, usurped upon the Commonwealth, the privileges, office, and franchises, and liberties of Brigadier-General of the Second Brigade, First Division, of Pennsylvania Volunteers, without any sufficient authority therefor, &c.

The case was heard before the court in banc, at Philadelphia, upon the suggestion of the relator, and answer of the respondent.

*McCall* and *Meredith,* for the relator.

———————— for the respondent.

The opinion of the court was delivered by

LOWRIE, J.—However much we may desire to get clear of any jurisdiction over questions of title to military offices, we cannot consider such a jurisdiction anomalous; for it is involved in the very nature of a state, that the government instituted by it must be supreme in relation to all the offices, authorities, and instrumentalities, by which it performs its functions: it must supervise them all, and their legitimacy depends upon its regular recognition of them. This is made emphatically the case, relative to all military offices and jurisdictions, by the declaration of the Constitution, that "the military shall, in all cases, and at all times, be in strict subordination to the civil power." It is not a department of the government, but only an instrument by which the will of the government may be executed in a portion of its duties. No military officer can have any authority that is not given him by the civil law, or sanctioned by military customs that are recognised as law by the civil authorities.

Though we leave the actual organization of the military power chiefly to itself; yet its organic law is prescribed by the legislature, and it can do nothing, beyond the acts of organization, except under the direction and control of the civil power. Even in its acts of organization we have not been able to detach it from contact, at many points, with the civil system, and have not attempted to do it. All its elections, and contested elections, are reported to the civil government, and thence issue all its commissions. It has its own courts, deciding conclusively upon most of matters relating to its organization, or to breaches of its organic law; but their authority is derived entirely from the civil government, and their acts can have no force without its sanction, express or implied. The civil courts do not review their proceedings, yet they may have to inquire into their jurisdiction and constitution.

In the very nature of things the supreme government must settle all disputes arising among subordinate functionaries, and the main question here is, where, in our system of government,

[Commonwealth *ex rel.* Tyler *v.* Small.]

and in this sort of dispute, is this supremacy deposited? The principles already announced show plainly enough that, even if the governor has it, it is not by virtue of his military office of commander-in-chief; but by virtue of his civil office of governor, unless, as a part of the military order, a revisory jurisdiction has been vested in him, by the civil power, over the military tribunal to which this dispute is committed by law. His power of command involves no power of appointment to office, as our whole civil and military system clearly shows. And if he is not constituted, by Act of Assembly, the judge of the right to a military office, then this jurisdiction must be sought elsewhere.

In the last resort this supremacy is, of course, in the people of the state, and we are to inquire, to what functionaries they have intrusted its administration. The state allows each brigade to elect its own general; how does it provide that a contested election shall be tried? The Act of 1822, s. 20, says it shall be by a board of officers, consisting of the major-general, or senior officer of the division, and two other field officers thereof. They are to hear the case, and "either confirm, or set aside any such election as the justice of the case may require, and make report thereof to the proper authority." The fact that the law requires all election returns of military officers to be made to the secretary of the Commonwealth, seems to make it very clear that he is "the proper authority" intended, and to him the report was made in this case.

It is argued that, because the board of officers are bound to report to the secretary of the Commonwealth, this gives him, or the governor, a right to review and set aside the report. But this is a very great mistake; for this order is adopted only that the secretary may be duly informed who are entitled to commissions, and he is merely a ministerial officer in issuing them. Military elections have nothing peculiar in this respect; for all offices that require a commission are thus certified to the secretary; and it is done as evidence of title to the commission, and that there may be a regular record of them at the seat of government. These purposes are sufficient to account for the regulation, without inferring that it gives any revisory authority. The report of a board of officers, confirming or setting aside a contested election, is a part of the same machinery, and is sent to the secretary for the same purpose. The fact that a military election, or contested election, is to be reported to the secretary, does not give him or the governor a right to review it, any more than a similar proceeding in relation to a civil office gives him that right. His duty in relation to it is performed when he has issued the commission, and recorded the fact. The governor signs the commission as governor, and not as commander-in-chief.

Indeed the law is express, that such is the effect of the report

[Commonwealth *ex rel.* Tyler *v.* Small.]

of the board of officers; for it declares that "the commission shall be void and the office vacant," as the effect of a report setting aside the election.   Besides this, no such control is given to the government over the sentences of courts martial, except in the single case of the trial of a major-general, and there it is expressly given to him as the next and only superior officer in the military order.   And when we further consider that the acts of 1822 and 1849 were intended to provide a complete militia system, we find ourselves entirely excluded from adding anything to it, by implication, that is not essential to its operation.

With such clear light to guide us it is impossible that the remote analogies attempted to be drawn from other military systems in favour of the power of the commander-in-chief can make any impression on our minds.   We are clear of all doubt that the supreme authority for trying this contested election was the board of officers, and not the governor, and that their decision against the right of Wm. F. Small to the office of brigadier-general is conclusive.

The question now arises, by what authority shall the usurper of a military office be excluded?   An office is a right to some public employment, and the usurpation of it is as much the invasion of a right as is the wrongful entry into another person's land, and it seems quite natural to suppose that it is to be remedied by that department of the government which has the general jurisdiction of questions of disputed rights.   The usual form of remedy for the trial of such questions is the process of *quo warranto*, the common law definition of which is, that it is in the nature of a writ of right of the public against him who usurps *any* office, franchise, or liberty, to inquire by what authority he supports his claim, in order to determine the right; and this is a judicial remedy.

Military officers certainly fall within this definition of the remedy, and this is quite consistent with that strict subordination of the military to the civil power which the constitution requires.   In a civil or military system where the crown is the source of all office, and no one can act at all as an officer without its sanction, the interference of the judiciary is entirely inappropriate in relation to official titles; its authority is exercised only when the right to an office is derived from some subordinate source, regulated by law, and not by the will of the sovereign.   In the latter case it is not needed, for there is another adequate and more prompt remedy.   But even where the right to all military offices is derived from the crown, the writ of prohibition, issued by a civil court, most sternly restrains all action of military and naval courts to their jurisdiction as it is recognised by the civil power: and all acts done by them, in excess of such jurisdiction, are treated as void; all which necessarily involves the jurisdiction of the courts to investigate military conduct and authority.   Under our system

[Commonwealth *ex rel*. Tyler *v*. Small.]

the law is substantially the same. Even the military fines which may be imposed are all, or nearly all, to be collected by means of the courts or other civil officers.

It is said that such an exercise of jurisdiction as is here demanded was never heard of before : but this argument amounts to nothing, unless it can be shown that the sentence of a board of officers trying a contested election, has ever before been attempted to be set aside by any officer. And then it would have very little weight, unless it should be shown that such was the usual interpretation of the law, and the practice under it.

The purpose of this process is to try the title to a military office ; and why should this not be tried by the same tribunals that try the titles to most other offices ? They all issue from the same source, and are all parts or instruments of the same state government. If the right to the civil and higher offices may be tried in this way, why may not the military and subordinate offices be thus tried, if no other mode of settling the difficulty is provided ? There is certainly nothing in the nature of military offices that makes it more strange that the judiciary should decide upon the title to them, than upon that of supervisors of roads, overseers of the poor, or other county, township, or corporation functionaries. In all of them alike it is the mere performance of the ordinary duty of applying the law to the facts, and declaring what the law requires under given circumstances. In the present case we have nothing to decide, after ascertaining our duty to decide anything, except that the law makes the decision of the board of officers, in the case of a contested military election, conclusive for or against the title to the office.

It is supposed that our jurisdiction cannot extend to such cases, because we cannot order a new military election, as the law contemplates that we may do, in proper cases for a *quo warranto*. But why can we not, when the law says we may ? We have no more power to order civil than military elections, except in carrying out the process of *quo warranto ;* and then we have power, if the law says so. It is said that, according to law, the major general must order this election : then our order would issue to him, just as in civil cases, it would issue to the sheriff or other officer, any of whom would act independently of the court in any other cases. Even if the court should pass out of the regular form for conducting military elections, it would not be surprising ; for its interference takes place only when the regular form has been disregarded and the whole case has become an exception to the general rule of the law.

We do not try this contested election, for it has already been tried according to the forms prescribed by law ; and we only decide that that trial has determined that W. F. Small was not duly elected brigadier-general, and has no title to the office. He sets

up, in avoidance of that decision, that the commander-in-chief · reviewed it, and set it aside, and gave him his commission. As civil judiciary we decide that the jurisdiction of the commander-in-chief does not extend to such a case: he is not an appellate court for such a purpose; but the board of officers is supreme, and their decision we must enforce.

The relator shows sufficient evidence of title in himself to authorize him to institute this proceeding: 2 *T. R.* 259; 6 *Ad. & E.* 348; 7 *Id.* 215, 419, 966. He acquired it at a subsequent election, and if that is not contested on any other grounds than the supposed validity of the prior election, then of course he is entitled to the office. But his title grows out of a different transaction from the one on which the defendant's title is vested, and is not directly involved in the true issue here, and we give no judgment in relation to it.

> March 10th, 1856. This cause came on to be heard at the present term, on the pleadings, and was argued by counsel. Whereupon it is considered and adjudged by the court here that the said William F. Small do not in any manner intermeddle with or concern himself about the said office of brigadier-general, of the second brigade, in the first division of volunteers, but that he be *ousted*, and altogether excluded from exercising or using the same for the future; and that the said John Tyler, Jr., the relator, do recover against the said William F. Small his costs by him expended in this behalf.

BLACK, J.—I do not think we have jurisdiction of this question. Believing that we have no authority to interfere, I would of course abstain from expressing any opinion on the legality of the governor's act in setting aside the decision of the board of officers.

———

On a subsequent day, on motion, the court sitting in banc, at Harrisburg, awarded an injunction enjoining the defendant, William F. Small, from interfering in, or in any wise intermeddling with the duties and office of brigadier-general of the said brigade.

On the     day of     proof of the service of the foregoing injunction having been made to the court, and it being further suggested that the defendant, since the service of the same upon him, had continued, contrary thereto, to hold and exercise the office of brigadier-general, and had assumed and exercised the office, power, and duties of brigadier-general, in violation of the order and writ of this court, and upon proof of the same, the court granted a rule on the said Wm. F. Small, to show cause why an attachment should not issue against him, as for a contempt in disobeying the writ and process of this court.

[Commonwealth *ex rel.* Tyler *v.* Small.]

This rule came on for hearing before the court in banc, at Harrisburg, on the 5th day of June, 1856, and was argued by

*McCall* and *Meredith,* for relator, and

*W. F. Small,* in *propria persona.*

The opinion of the court was delivered by

Lowrie, J.—There can be nothing plainer and more definite than our duty in relation to this case. Our judgment is resisted, and the law requires us to enforce it, and declares how it shall be done. We have gone out of the usual course, and allowed the defendant to endeavour to show us that our judgment is wrong, and he has failed to do it. And this is the third time we have heard him in the case. What we have now to say is not so much to answer the last argument, which advanced nothing new, as to show the necessity that demands submission to the decision of this court.

The defendant has claimed and still claims to be a high and honourable officer of the militia of this state, and therefore one of the conservators of its peace and dignity as a state; for, by the Constitution, (Art. 6, s. 2,) the military are "armed, organized, and disciplined for its defence," and for no other purpose. If he has claimed that position in the sincerity of an orderly citizen, he has claimed it as an office instituted by the civil power of the state, and has undertaken, on the honour of a military officer, and as a military officer, to be "in all cases and at all times in strict subordination to the civil power;" for such are the very terms in which the Constitution (Art. 9, s. 22) defines the duty of that branch of its organized force. The degree of this subordination is sufficiently illustrated by the law which requires even a major-general and all his subordinates to obey the orders of a mere police officer (in Philadelphia), when that officer decides that the military force is necessary for the maintenance of public order. On his requisition the highest grade of military office is bound to obey without question and without responsibility; and this obligation is directly analogous to that which is imposed on every citizen when the sheriff requires the aid of the *posse comitatus.*

The defendant's right to the office which he claims, was decided against him when the highest court for the trial of military elections, provided by the law for such a case, set aside his election on which the claim is based. He appealed to the governor, who refused to entertain the appeal. And in this he was unquestionably right; for the law has given him no power of review in such a case. As governor he had, of course, nothing to do with the case as a disputed election. In that capacity his duty was merely the ministerial one of issuing the commission required by the law,

[Commonwealth *ex rel.* Tyler *v.* Small.]

if the election was uncontested, or, being contested, was confirmed by the court, which the law has instituted for deciding upon it. A military commission issued by him, founded upon an election that has been set aside by the court appointed by the law to try it, is mere waste paper in the hands of its holder, just as much so as would be the commission of a judge or justice of the peace, issued by him under similar circumstances.

As commander-in-chief, the governor is himself part of the militia, and of course with it strictly subordinate to the civil power. It is involved in that subordination that the whole organization of the military power must be regulated by the civil government, and founded upon its expressed will. No commander-in-chief or other military officer can, therefore, have any implied authority, except such as is necessarily implied from the duties imposed upon him, because necessary to the performance of those duties. He can have no appointing power, except in those very special cases in which it may be expressly given to him. We should, indeed, have made a very absurd oversight in constitutional legislation, if, while guarding against military encroachments, we had given up all civil supervision of military organization, and had left the final power of appointment to military office in the hands of the commander-in-chief. He would have this power if he could review and correct the decisions in all cases of contested elections. We say, therefore, that neither as governor nor as commander-in-chief could he set aside the decision of the court that declared the defendant's election void, and invest him with the office. The law makes that decision the final proof against the right to the commission.

But on the coming in of a new commander-in-chief, the defendant presented an appeal to him, and he, erroneously and without authority, set aside the previous decisions, gave the defendant a commission, and he entered upon the office. Thus far the defendant was guilty of no legal offence, for he only sought the correction of a supposed error, and in a supposed regular form.

Then the Commonwealth's prerogative writ of *quo warranto*, the highest remedy which the state could provide for the orderly and peaceable settlement of disputed titles to office, was issued against him. His claim was heard before the highest civil tribunal for the trial of disputed rights, and for the preservation of order that the Constitution has provided. It was deliberately heard—twice heard, and carefully considered—as carefully as can be expected from mere human functionaries. At first hearing no expression of opinion on his title fell from the court, for it was not necessary; doubt was a sufficient ground for the action then demanded. All expression of opinion was then studiously avoided, because the dispute was of a kind that very rarely occurs, and it was thought prudent by the court to reserve their conviction until

[Commonwealth *ex rel.* Tyler *v.* Small.]

the fullest reflection and the final argument should justify and demand their expression.

Before that highest civil tribunal, and in that highest .civil process for such a case, it was decided that the defendant's commission was void, and he was commanded to abstain from all further intermeddling with the office. If that decision is not to be obeyed, then the state is helpless against military usurpation. Her highest tribunal for the management of such affairs has spoken, and is disregarded. The means of order which she has provided are exhausted, fruitlessly exhausted. The force that is organized for her defence, has turned its arms against her; it has cast away the subordination which the people have required, and has declared its own judgment to be the highest rule of right. The military officers, who are recognised by the civil power, are excluded from their position by those who reject the judgment of the civil power, and who are disowned by it.

We cannot doubt about the correctness of our decision against the defendant's claim to the office of brigadier-general, even after now hearing him present a third argument on the subject. But assume that we were mistaken in our interpretation of the law, even then he is bound to submit, for he is not empowered to review our decisions, and there can be no review of the judgment of the highest court which the people have thought proper to establish. Even the commander-in-chief, as part of the militia, is bound by the command of the Constitution until martial law is properly proclaimed; and until then he would be disorderly in recognising any military officer whose commission has been in due form of law declared invalid.

Assume that we were in fact mistaken in our judgment; still, having performed our duty according to the best of our learning and ability, we have done all that the state requires of us in the case; and she can require no more so long as government is administered by human agency. Our decision must be the very law of this case; for the people have required us to ascertain and declare it, and we have done so exactly as required, that is, according to the highest judicial skill that we possess. He that resists our judgment denies the competency of the people to institute a government that can fulfil all its duties. Perfection of judgment is not the test of legitimacy of power, or of the duty of submission to its decisions, for humanity can neither bear the test nor apply it. The decisions which we pronounce the law requires us to enforce, whether parties and their friends approve of them or not. This must be true, if government is to be worth anything.

The legislature has invested the courts with that portion of the governmental power by which titles to office generally, not excepting military ones, are tried and enforced. This court has pronounced its decision, and the defendant says that we are in error

[Commonwealth *ex rel.* Tyler *v.* Small.]

in interfering with military officers—notwithstanding their declared subordination to this court as a branch of the civil power. If it is supposed that we have thus marred the symmetry of the military system, it ought also to be known that there is no power to correct this but the legislature, by the passage of a new law. Our judgment was published many weeks before the late adjournment of the legislature, and they saw nothing in it that needed correction, and the defendant applied for none.

The final judgment on this case, thus pronounced and sanctioned, the defendant has ventured to resist, and others, as mistaken as himself, have joined him in this resistance. If no serious disturbance of the public peace has arisen from his disregard of law, it is only because others have been more considerate than he. He has persisted in acting upon a commission that has been annulled in his hands by the very process which the people have provided for that purpose. He has converted the means of discipline, intended for the defence of order, into a means of disturbing that order, and thus has turned the instrument against the power that ought to wield it; for it is the civil government alone that stands for the state, and the military is only an instrument that it uses as its judgment requires. Better far that a whole brigade should be disbanded than that the city of Philadelphia should be the scene of one hour of riot; and so far as they are unwilling to submit to the civil authorities they ought to be disbanded, for they are useless for the purpose for which they were instituted; or rather they are dangerous enemies of that purpose.

We need not magnify the heinousness of this offence, and we cannot magnify the danger that is involved in the principle on which the defendant is acting. It is just such disorders of individuals that continually and necessarily lead to the multiplication and severity of laws, and to that strictness of government by which the liberty of orderly citizens is unduly restricted, in the attempt to control the disorderly and lawless. It is just such individual and associated disorders that have, in all ages, led to that degree of anarchy that has compelled quiet and industrious citizens to seek the protection of a monarchy, or even of a military despotism, as a means of saving them from those distressing uncertainties and that depressing insecurity that tends directly to barbarism, by blighting those hopes of the future that are the foundation of the honesty, energy, and activity of the present. It is just such disorders that are continually increasing the expense and the sternness of the government of all our large towns, and that are likely still further to increase them; for, since the world began, the disorderly were never allowed a permanence of power, and they never will be.

We need not say how much the peace of Philadelphia would have been endangered, if others had been as reckless in asserting

[Commonwealth *ex rel.* Tyler *v.* Small.]

valid rights as the defendant has been in asserting an unfounded
one. We prefer not to think of it.

He has dangerously and grievously offended against the peace
and dignity of the state, and yet we may hope that he has acted
more from misjudgment than from wickedness. We trust that he
will retrace his steps. He will do so when he begins to suspect,
as he ought to do, that he is a very unfit judge in his own case.
He will do so when he allows his excited feelings to cool down so
far as to give his reason a fair chance to perform its functions.
He will do so when he separates himself from those who have
become excited in the same cause with himself, and calmly sub-
mits to his own conscience the question of his duty to the state,
in view of all the danger that is involved in his action. Only
excitement, not reflection, is found in an interested and partisan
crowd.

The state, through the legislature, declared its estimate of the
danger which may grow out of a usurpation of a public office,
when it empowered the courts, in such a case as this, to enforce
obedience by attachment and by sequestration. By the latter
writ all the defendant's property and effects may be taken into
the custody of the state until he repents and submits. By the
former he may incur such punishment as is ordinarily visited
upon those who disregard the order of the state and contemn its
authority as expressed by its constituted tribunals, and such
restraint of liberty as is necessary to enforce obedience.

The imprisonment of the party who is in contempt is one of
the ordinary steps in all proceedings of this kind, and is usually
ordered as a matter of course, until he submits; and as one of
the means of enforcing the decree in favour of the plaintiff.
Besides this there is the remedy to the state for the disorderly
conduct of the defendant in contemning her authority and resist-
ing the process of her courts; and on the reading of the plaintiff's
affidavits, and the granting of the petition for the attachment, we
were apprehensive that we might have to inflict a punishment for
this, but the present hearing has led us to believe that this is un-
necessary.

We must see that these remedies are put in operation, so far as
is necessary for the case. However indulgently we might be dis-
posed to treat mere private offenders, we cannot suffer it to be
supposed that any indulgence can be shown to insubordination
that claims to be official, or that the authority of the state can be
contemned with impunity, under the colour of an office. But we
do not think proper to impose any penalty, in the character of
punishment, as the case at present appears.

We have perhaps said more than we are called upon to say
under the present aspect of this case; but we have done it with
the hope that these suggestions may lead to that reflection which

[Commonwealth *ex rel.* Tyler *v.* Small.]

a regard for public order demands. Our duty is now simply the ordinary one of entering the usual order by which such decisions are to be enforced.

And now, to wit, June 5th, 1856: The said defendant, William F. Small, having been brought before the court, sitting at Harrisburg, on an attachment for contempt in disobeying the injunction issued in this case, and having been heard in relation thereto, and having admitted that he was served with notice of the said injunction and that he had afterwards disobeyed it, and having persisted in refusing to obey the same, this court both declare and adjudge that the same William F. Small has been and is guilty of a contempt of this court, in wilfully refusing to comply with the said injunction, and that such misconduct has impaired, impeded, and prejudiced the rights and remedies of the plaintiff in this cause; and it is therefore ordered, that the said William F. Small pay the costs and expenses of the proceedings in relation to the said contempt, and that for remedy of the plaintiff in this behalf, he be committed to the debtor's apartment of the prison of the city and county of Philadelphia until the said costs and expenses be paid; and further, that he stand committed until the further order of this court, or until, on petition and *habeas corpus* from this court, he shall, upon oath before one of the judges thereof, declare and say to the satisfaction of such judge, that he will always hereafter abstain from the exercise of the office of brigadier-general of the second brigade of the first division of the militia, under or by virtue of the election and commission, or either of them, on which he has heretofore, in this cause, founded his claim to the said office, and that a warrant issue accordingly to the sheriff of the city and county of Philadelphia.