## Philadelphia Marine Trade Association v. International Longshoremen's Association, Appellant.

501

Argued January 15, 1958. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, JONES and COHEN, JJ.

*Abraham E. Freedman,* with him *Avram G. Adler,* and *Freedman, Landy and Lorry,* for appellants.

*Francis A. Scanlan,* with him *Robert G. Kelly, Thomas F. Mount, Owen B. Rhoads, Kelly, Deasey & Scanlan, Rawle and Henderson,* and *Barnes, Dechert, Price, Myers & Rhoads,* for appellees.

Opinion by Mr. Justice Chidsey:

These appeals are from two orders adjudging the appellant labor union and several of its officers, agents and members, appellants also, guilty of contempt in having violated a preliminary injunction entered by the court below, and sentencing them respectively to pay fines varying from $200 to $1,000.

The injunction was issued in a labor controversy which concerned the introduction of certain technological changes in the unloading of vessels at a pier in the Port of Philadelphia which would have reduced by about one-third the number of longshoremen employed in a particular working unit of 167 men. One of the underlying disagreements between the union and its members on the one hand and the employer and its representatives on the other, was whether the collective bargaining agreement governing the relationship provided for "renegotiation" or "arbitration" in the solution of this disagreement as to the number of men to be employed after the changes in the manner of unloading vessels.

On March 23, 1955 appellees[1] filed a complaint in equity seeking injunctive relief because of the refusal of appellants to unload a vessel then in port, and on the same day the court below, without an appearance by appellants, granted a preliminary injunction restraining appellants from (1) interfering "in any un-

---

[1] Appellees are the plaintiffs in the action, namely, Philadelphia Marine Trade Association, the National Sugar Refining Company and Dugan & McNamara, Inc. The sugar company operates a refinery in Philadelphia and its premises include a pier at which vessels carrying raw sugar are unloaded by plaintiff Dugan & McNamara, Inc., contracting stevedore employed by the sugar company. The trade association is the collective bargaining agent for its members that employ deep sea longshoremen, including Dugan & McNamara, Inc., the employer of the longshoremen here involved.

lawful manner" with operation at National Sugar Company's refinery, (2) violating the collective bargaining agreement, (3) refusing to arbitrate under the agreement, (4) violating a no work stoppage agreement, (5) refusing to supply longshoremen to unload at the pier, and ordered a hearing to be held two days later on March 25, 1955. After the hearing on March 25, 1955, the court below ordered the preliminary injunction to be continued until final hearing, and from that order appellants prosecuted an appeal to this Court on March 28, 1955.

While the appeal was pending, the men refused to unload the vessel at the pier unless all 167 men in the work-gang were put to work, or to submit to arbitration. On April 4th, appellees filed a petition for a rule upon appellants to show cause why they should not be attached for contempt of the court order of March 23, 1955 (continued in force and effect on March 25th) and that the individual defendants be held in custody until they complied therewith. The rule was granted on the same day and made returnable on April 7th, later changed to April 11th (during which time appellants applied to this Court for a supersedeas, which was denied). In its answer, among other objections, appellants demanded a jury trial in accordance with the Act of June 23, 1931, P. L. 925, §1, 17 PS §2047.

On April 13, 1955, the court below adjudged appellants in contempt "Having determined that the defendants have failed to comply with [the] court's order dated March 23, 1955", and fined the eight individual appellants (officers and agents of the International and Local Union) $200 each, and the appellant Local Union itself the sum of $500. In its opinion filed in connection with that order, the court below rejected appellants' motion for a jury trial stating ". . .

it is only in cases where the acts charged are indictable as crimes that the right exists," citing *Philadelphia & Reading Coal & Iron Co. v. Whary et al.*, 52 D. & C. 83, as its sole authority for that proposition.

On April 27, 1955, this Court affirmed the March 23 and March 25, 1955 orders of the court below (our opinion, however, was not filed until June 27, 1955, see *Philadelphia Marine Trade Association v. International Longshoremen's Association, Local Union No. 1291*, 382 Pa. 326, 115 A. 2d 733), in an opinion which dealt with the merits of the injunctive orders, but, of course, did not concern itself with the contempt citation of April 13, 1955, which arose after certiorari had issued from this Court.

Following the contempt hearing of April 13, 1955, the union submitted the dispute to arbitration, but this procedure broke down shortly thereafter. On May 2, 1955, the ship which had arrived at the pier on March 22, 1955 still remained unloaded and appellees thereupon brought a "Petition to Compel Compliance with Orders of Court Dated March 23 and 25, 1955" in the court below, praying a rule to show cause (1) why the property of the appellants should not be sequestered, (2) why the appellants should not be fined $15,000 per day commencing April 28, 1955 for the use of appellees, (3) and other relief. The rule to show cause was granted on May 2nd, made returnable on May 5th, and appellants filed a motion to dismiss, again demanding a jury trial under the provisions of the Act of June 23, 1931, supra, among other prayers, and also filed an answer to the petition and rule. On the 4th day of May, the Federal Mediation Service stepped into the dispute between the union members and the employer representatives, and after the Federal Mediator addressed the 167 men in the work-gang, the men voted to return to work pending a final de-

cision as to the number of longshoremen to be employed at the pier in the future. On the following day, May 5th, the court was informed that the men were returning to work and a continuance was granted until May 13th. On May 13, 1955, after a hearing, the court below held the appellant union and the appellant Askew, its president, guilty of continuing contempt of its order of March 23, 1955, from April 13, 1955 (the date of the first contempt order) until May 4, 1955, and fined the union $1,000 and Askew $250.

From the orders of April 13, 1955 and May 13, 1955, holding the appellants in contempt and imposing the fines as above stated, these appeals are prosecuted. We are of the opinion that the orders must be reversed. It is clear that the court below, failing to observe the distinctions among the various forms of contempt recognized in this Commonwealth, did not afford to appellants the procedural safeguards which the Legislature and the decisions of this Court have held them to be entitled.

In the petition for attachment filed by appellees in the first of the two contempt proceedings, the petitioners prayed that the individual appellants be held in custody until such time as they would perform in accordance with the preliminary injunction which, on March 23, 1955, had been entered by the court on petitioners' behalf. In their "Petition to Compel Compliance" filed in connection with the second contempt proceeding, appellees prayed that the appellants be required to show cause why their property should not be sequestered and why they should not be fined $15,-000 per day "for the use and benefit of the [appellees]". The relief requested by the appellees was unquestionably in the nature of a civil contempt proceeding. As we noted in *Knaus v. Knaus*, 387 Pa. 370, 127 A. 2d 669, at p. 377: ". . . where the act of contempt

complained of is the refusal to do or refrain from doing some act ordered or prohibited primarily for the benefit of a private party, proceedings to enforce compliance with the decree of the court are civil in nature. The purpose of a civil contempt proceeding is remedial, and judicial sanctions are employed (1) to coerce the defendant into compliance with the court's order, and (2) in some instances to compensate the complainant for losses sustained: United States v. United Mine Workers of America, 330 U. S. 258, 303." Furthermore, every one of the indicia which we set forth in the *Knaus* case, supra, at p. 378, was present in these two petitions: "The factors generally said to point to a civil contempt are these: (1) Where the complainant is a private person as opposed to the government or a governmental agency; (2) where the proceeding is entitled in the original injunction action and filed as a continuation thereof as opposed to a separate and independent action; (3) where holding the defendant in contempt affords relief to a private party; (4) where the relief requested is primarily for the benefit of the complainant; and (5) where the acts of contempt complained of are primarily civil in character and do not of themselves constitute crimes or conduct by the defendant so contumelious that the court is impelled to act on its own motion. . . ." The petitions in the instant case were brought by private parties, styled as in the original injunction action and filed as a continuation thereof, the relief afforded by the contempt proceeding was for the benefit of private parties, namely the complainants, and the acts of contempt complained of were not offenses against organized society. In their first petition, appellees were praying that appellants be coerced into compliance with the court's order and in the second petition appellees were praying compensation for the losses they had sustained.

. The court below, however, although holding appellants in contempt, did not provide appellees with the relief requested; instead it vindicated its own dignity and authority in each instance by punishing the appellants through the imposition of fines. The order of April 13, 1955 was not prospective in nature seeking to compel compliance by appellants for the benefit of the appellees, but was retrospective. In its own terms it stated: "Having determined that the defendants have failed to comply with this court's order dated March 23, 1955, which was continued after hearing on March 25, 1955, defendants . . . are fined the sum of $200 each, and defendant . . . Union . . . is fined the sum of $500". The second contempt order was even more clearly punitive in nature, both by its own terms and because it was entered after appellants had, for all practical purposes, complied with the preliminary injunction in the court below. There can be no doubt that although appellees were requesting relief in the form of a civil contempt proceeding, the court below was holding appellants guilty of criminal contempt.

Were the distinction merely one of nomenclature, it would be of no great moment that the court below applied the wrong label. The distinction, however, is of substantial import, in that the rights attendant to and the consequences flowing from a finding of contempt differ considerably in each instance. ". . . Contempts broadly fall into two categories, civil and criminal. Criminal contempts are further subdivided into direct and indirect contempts." *Knaus v. Knaus,* supra, at p. 375; and see *Casco Products Corporation v. Hess Brothers, Inc.,* 184 Pa. Superior Ct. 47, 51; 132 A. 2d 922. The types of contempt differ not only with respect to their nature, but in the procedure to be followed and the penalty which may be imposed in each instance.

A direct criminal contempt consists of misconduct of a person in the presence of the court, or disobedience to or neglect of the lawful process of the court, or to misbehavior so near thereto as to interfere with the court's immediate business: Act of June 16, 1836, P. L. 784, §§23, 24, 17 PS §§2041, 2042; *Levine Contempt Case*, 372 Pa. 612, 95 A. 2d 222; *Snyder's Case*, 301 Pa. 276, 152 A. 33. Punishment for such contempt may be inflicted summarily in accordance with the Act of 1836. The Act of 1836 provided further in Section 24 that: "The punishment of imprisonment for contempt, as aforesaid, shall extend only to such contempts as shall be committed in open court, and all other contempts shall be punished by fine only." It should be noted that the Act of 1836 was not applicable to civil contempts: see *Commonwealth ex rel. Lieberum v. Lewis*, 253 Pa. 175, 98 A. 31. The class of "all other contempts" was the class of criminal contempts which in this Commonwealth have become known as "indirect criminal contempts", namely, those which occurred outside of the presence of the court itself: *Penn Anthracite Mining Co. v. Anthracite Miners of Pennsylvania et al.*, 318 Pa. 401, 178 A. 291; *Kegg et al. v. Bianco et al.*, 151 Pa. Superior Ct. 234, 30 A. 2d 159. The reference of the term "criminal" in the context of "criminal contempts" does not relate only to indictable crimes. It is rather a means of distinguishing between those contempt proceedings which we call civil, namely those in which the dominant purpose is to enforce compliance with an order of court for the benefit of the party in whose favor the order runs; and those which are known as criminal, namely those in which the dominant purpose is to vindicate the dignity and authority of the court, and to protect the interests of the general public: see *Gompers v. Bucks Stove & Range Company*, 221 U. S. 418; *United*

*States v. United Mine Workers of America,* 330 U. S. 258; *Patterson v. Wyoming Valley District Council,* 31 Pa. Superior Ct. 112; *Knaus v. Knaus,* supra. While the *Penn Anthracite Mining Co. v. Anthracite Miners of Pennsylvania et al.,* and the *Kegg et al. v. Bianco et al.* cases, supra, involve situations where those who had been contemptuous of the order of the court had committed indictable criminal offenses, the punishments meted out were punishments directed to the contempt of the court, and were not intended as substitutes for the punishments directed for the indictable crimes under the applicable provisions of this State's Penal Code. This is made perfectly clear in the case of *Casco Products Corporation v. Hess Brothers, Inc.,* supra, in which the Superior Court, in an opinion by President Judge RHODES, held the defendants guilty of indirect criminal contempt for the violation of an injunction relating to sales in violation of the Pennsylvania Fair Trade Act of 1935, and in which no indictable crimes were committed. The only contrary authority which has been cited to us is the case of *Philadelphia & Reading Coal & Iron Co. v. Whary et al.,* supra, in which the common pleas court overruled a demand for a jury trial under the Act of 1931, holding that the proceeding before it was one in civil contempt (relating to a preliminary injunction barring the defendants from trespassing on plaintiff's land) and was not one in indirect criminal contempt under the Act. In its opinion the court of common pleas, by an analogy to the contempt provisions in the Federal Clayton Act of October 15, 1914, 38 Stat. 738, 28 U.S.C. Sec. 381 et seq., opined that the Pennsylvania Act of 1931 applied only to indirect criminal contempts where the Act complained of itself consisted of an indictable criminal offense. In this dicta, the court of common pleas was clearly wrong. To analogize a Federal Act,

which by its terms specifically dealt with contempt wherein the act or thing done also constituted a criminal offense under any statute of the United States or law of any State, to a Pennsylvania statute which applies "in all cases where a person shall be charged with indirect criminal contempt for violation of a restraining order or injunction issued by a court or judge or judges thereof", and to buttress the conclusions based upon such an analogy with conclusions flowing from the coincidence of two prior Pennsylvania appellate court decisions relating to indirect criminal contempt fortuitously being cases where the defendants therein could, if another proceeding were instituted, be found guilty of indictable crimes, is reasoning too fallacious to require further comment. It should be noted, however, that insofar as the basic holding in the *Philadeldelphia & Reading Coal & Iron Co.* case was concerned, the proceedings were titled apparently as in the original injunction action, were filed apparently as a continuation thereof, the complainant was a private person (corporation) and not the government or a governmental agency, and the proceedings were apparently instituted for the benefit of the complainant. Therefore, from all that appears in the opinion, the case was in fact one of civil contempt, which, apart from the dicta, is all that the court really held, or was necessary for it to hold in the disposition of the case.

Indirect criminal contempts in this Commonwealth are governed by the Act of June 23, 1931, P. L. 925, 17 PS §§2047, 2048. That Act contains procedural safeguards requiring admission to bail, notice, a reasonable time to make a defense, the right to file a demand for retirement of the judge sitting in the proceeding in certain instances, and provisions for trial by jury. Furthermore, the punishment in such cases is limited to a fine not exceeding $100, or imprisonment, not exceeding 15 days.

The proceedings, purposes, and punishments in a civil contempt are quite distinguishable. As pointed out above, the proceedings are instituted by a private party, for his own benefit, and the proceeding generally is a continuation of the original injunction action. "The primary objective or purpose of punishment for civil contempt is to coerce the defendant into compliance with the decree of the court and thereby provide the remedy ordered for the benefit of the plaintiff. Every order which imposes punishment for civil contempt should state the condition which, upon fulfillment, will result in the release of the defendant or the remission of the fine." *Knaus v. Knaus,* supra.

That the procedures and purposes and punishments are distinguishable does not mean that the same set of facts cannot give rise to more than one type of contempt. Indeed, it is clear that a judgment in a civil contempt proceeding for the benefit of a private plaintiff will, of course, incidentally vindicate the authority of the court. Just as on the other hand a criminal contempt judgment, which is punitive, may often advance private interest. But this is not to say that the procedures appurtenant to each specific type of contempt may be so commingled as to take from a party the rights which it is by law entitled to enjoy or to give that party benefits to which it has no right. The punishments in an indirect criminal contempt must be in strict accord with the applicable statutes of this Commonwealth and the coercive measures in a civil contempt must specify the conditions upon which compliance by the defendant will result in release therefrom.

In the instant case, the inexact reasoning of the court below so tangled the various contempt procedures that the appellees neither got the relief for which they prayed, nor did the appellants receive the

protections to which they were entitled by law. As civil contempt proceedings, the orders of the court below were wholly inappropriate in that they purported to punish appellants for past acts of misbehavior, rather than setting forth the conditions of compliance to which appellants were required to conform and conditioning its punitive measures on failure to comply therewith. Even if viewed as indirect criminal contempts, appellants were not afforded the trial by jury which they had timely demanded and to which they had a right under the Act of 1931, and the penalties visited upon them were in excess of the permissible limits set forth in Section 2 of that Act.

The orders of April 13, 1955 and May 13, 1955 sentencing appellants to the payment of fines for contempt of court cannot be upheld.

---

OPINION PER CURIAM, May 2, 1958:

The foregoing opinion, written by Mr. Justice CHIDSEY prior to his death on April 19, 1958, is adopted and filed as the opinion of the Court.

Orders reversed with costs of these appeals payable equally by appellants and appellees.

---

CONCURRING OPINION BY MR. JUSTICE BELL:

I concur in the result reached by the majority, but disagree in some important and material respects with a portion of the majority's opinion.

It is well established that contempt may be of a civil or criminal character, and that criminal contempts are further divided in Pennsylvania into direct and indirect contempts: *Cox v. Cox*, 391 Pa. 572, 137 A. 2d 779; *Knaus v. Knaus*, 387 Pa. 370, 127 A. 2d 669.

In *Cox v. Cox*, 391 Pa., supra, this Court, quoting from *Knaus v. Knaus*, 387 Pa., supra, said with respect to the sub-divisions of criminal contempts (pages 580-581):

" 'A direct criminal contempt consists of misconduct of a person in the presence of the court, or so near thereto to interfere with its immediate business, and punishment for such contempts may be inflicted *summarily*\* : Act of June 16, 1836, P. L. 784, §§23, 24, 17 PS §§2041, 2042; Levine Contempt Case, 372 Pa. 612, 95 A. 2d 222; Snyder's Case, 301 Pa. 276, 152 A. 33.\*\* An indirect criminal contempt consists of the violation of an order or decree of a court which occurs outside the presence of the court: Penn Anthracite Mining Co. v. Anthracite Miners of Pennsylvania et al., 318 Pa. 401, 178 A. 291; Kegg et al. v. Bianco et al., 151 Pa. Superior Ct. 234, 30 A. 2d 159. The procedural safeguards applicable to a commitment for an indirect criminal contempt are set forth in the Act of June 23, 1931, P. L. 925, §1, 17 PS §2047, which requires admission to bail, notice, a reasonable time to make a defense and affords trial by jury. Section 2 of that Act (17 PS §2048) limits punishment to a maximum of a fine of $100., or imprisonment for fifteen (15) days, or both.' "

Civil contempt proceedings or orders, on the other hand, are those which are instituted or made primarily to preserve or enforce the rights of or recompense private parties to suits, and to compel obedience to orders and decrees made by the Court for the benefit of such parties. These are civil, remedial and coercive in their nature, and the parties chiefly interested there-

---

\* Italics throughout, ours.

\*\* *Green v. United States*, 356 U. S. 165 (March 31, 1958).

in are those individuals for the enforcement of whose private rights and remedies the suits were instituted: 12 Am. Jur. 392.

The line of demarcation denoting those acts which constitute civil as distinguished from criminal contempt, however, is often obscure. In *Knaus v. Knaus,* 387 Pa., supra, the Court provided the following guide in making this determination: "The dominant purpose of a contempt proceeding determines whether it is civil or criminal. If the dominant purpose is to vindicate the dignity and authority of the court and to protect the interest of the general public, it is a proceeding for criminal contempt. But where the act of contempt complained of is the refusal to do or refrain from doing some act ordered or prohibited primarily for the benefit of a private party, proceedings to enforce compliance with the decree of the court are civil in nature. The purpose of a civil contempt proceeding is remedial, and judicial sanctions are employed (1) to coerce the defendant into compliance with the court's order, and (2) in some instances to compensate the complainant for losses sustained: United States v. United Mine Workers of America, 330 U. S. 258, 303. A judgment in a civil contempt proceeding for the benefit of a private plaintiff will, of course, incidentally vindicate the authority of the court just as on the other hand a criminal contempt judgment, which is punitive, may often advance private interests. But the test is the dominant purpose, not the incidental result: Gompers v. Bucks Stove & Range Company, 221 U. S. 418."* Moreover, the law is clear that the same facts or conduct may constitute or amount to both civil and criminal contempt proceed-

---

* See also *United States v. United Mine Workers of America,* 330 U. S. 258; *Cox v. Cox,* 391 Pa., supra.

ings: *United States v. United Mine Workers of America*, 330 U. S., supra; *Knaus v. Knaus*, 387 Pa., supra. In *United States v. United Mine Workers of America*, 330 U. S., supra, the Court said (pages 298-299): "Common sense would recognize that conduct can amount to both civil and criminal contempt. The same acts may justify a court in resorting to coercive and to punitive measures."

In *Knaus v. Knaus*, a contempt order was vacated because the appellant was sentenced to imprisonment and was required to perform an act which was beyond his power to accomplish; in *Cox v. Cox* the order of the lower Court which was allegedly violated was too indefinite and uncertain to justify any contempt proceeding for its violation.

With this part of the majority opinion and with the decision in *Knaus v. Knaus* and *Cox v. Cox*, supra, I am in complete agreement.

However, the majority opinion, quoting from *Knaus v. Knaus* (reiterated by a dictum in *Cox v. Cox*) further states: " 'Every order which imposes punishment for civil contempt should state the condition which, upon fulfillment, will result in the release of the defendant or the remission of the fine.' " This statement from *Knaus v. Knaus* and *Cox v. Cox* was entirely correct, insofar as it applied to the factual situation which was present in those cases, but recent opinions of the Supreme Court of the United States demonstrate that, if it was intended to be a universal rule, it is too broad and therefore inaccurate.

The same thought was again expressed in the majority opinion: "As civil contempt proceedings, the orders of the court below were wholly inappropriate in that they purported to punish appellants for *past**

---

* Italics throughout, ours.

acts of misbehavior, rather than setting forth the conditions or compliance to which appellants were required to conform and conditioning its punitive measures on failure to comply therewith." This statement of the law is likewise inaccurate. It apparently holds that a Court can *never* impose a fine for civil contempt except upon a condition, and that civil contempt proceedings may *not* be utilized to punish defendants for *past* acts of misbehavior, i.e., civil contempt proceedings are solely *prospective* in nature. A study of pertinent decisions** of the Supreme Court reveals that such a proposition of law is contrary to the opinions of that Court. It is obvious that to prohibit civil contempt proceedings, for *past* acts of contempt, such as wilful defiance or non-compliance with the lawful orders and decrees of a court, would seriously impede the administration of justice and would often make a mockery of the courts of Pennsylvania and of justice. . The opinions and decisions of the Supreme Court of the United States make clear that a court can, for *past* acts of misbehavior amounting to *civil* contempt, impose an *unconditional* compensatory fine and/or a conditional imprisonment: *United States v. United Mine Workers of America,* 330 U. S. 258; *McComb v. Jacksonville Paper Co.,* 336 U. S. 187; *Gompers v. Bucks Stove & Range Co.,* 221 U. S. 418; also *Parker v. U. S.,* 126 F. 2d 370.

We commence with basic fundamentals. The power to punish for contempt is inherent in every court; it is a power which is essential and indispensable to its existence: *Green v. United States of America,* 356 U. S. 165; *Michaelson v. United States,* 266 U. S. 42 (1924); *Commonwealth v. Sheasley,* 102 Pa. Superior Ct. 384 (1931); *United States v. United Mine Workers of*

** See infra. .

*America,* 330 U. S., supra; *Commonwealth v. Perkins,* 124 Pa. 36, 48 (1889). In *Green v. United States,* 356 U. S., supra, defendants were sentenced to 3 years' imprisonment, after a hearing, for wilful disobedience to a "surrender order" of the lower Court. The Supreme Court sustained the convictions and sentences and said (page 183) : "The statements of this Court in a long and unbroken line of decisions involving contempts ranging from misbehavior in court to *disobedience of court orders* establish beyond peradventure that criminal contempts are not subject to jury trial as a matter of constitutional right."

Justice FRANKFURTER in a concurring opinion said : ". . . what is indisputable is that from the foundation of the United States the constitutionality of the power to punish for contempt without the intervention of a jury has not been doubted."

In *Commonwealth v. Perkins,* 124 Pa., supra, this Court said : "[1] Imprisonment for contempt committed in open court [or so near as to interfere with its proceedings] is imposed as a punishment and is for a definite period. [2] *Imprisonment* for disobedience to the process of the court is not so much for a punishment as to enforce such process, and ceases the moment the party purges himself of his contempt by obedience. The power in both instances is essential to the existence of the court. *A court that has not the power to protect itself from public insult, or to compel obedience to its lawful process, would be beneath contempt."*

In *Knaus v. Knaus,* 387 Pa., supra, this Court said (page 376) : "It has been held by this Court, however, that the Act of 1836 does not apply to an attachment to enforce a decree in equity : Commonwealth ex rel. Lieberum v. Lewis, 253 Pa. 175, 98 A. 31. In the Lieberum case this Court said (p. 181) : 'Under the fore-

going statutes and authorities, the provision of the Act of 1836, limiting the power of imprisonment to contempts which occurred in the presence of the court, has no application to cases of attachments to enforce civil remedies, where the object is to secure compliance with a decree of court. *The power to enforce their de-. crees is necessarily incident to the jurisdiction of courts.* Without such power, a decree would in many cases be useless. "All courts have this power, and must necessarily have it; otherwise they could not protect themselves from insult, or enforce obedience to their process. Without it, they would be utterly powerless": Williamson's Case, 26 Pa. 9, 18. In Commonwealth ex rel. Tyler v. Small, 26 Pa. 31, it was said (page 42) : "The imprisonment of the party who is in contempt is one of the ordinary steps in all proceedings of this kind, and is usually ordered as a matter of course, until he submits; and as *one* of the means of enforcing the decree in favor of the plaintiff." ' "

In those factual situations, which involved, as in the instant case, *past* acts of disobedience and contempt, the courts are clearly empowered to invoke civil contempt proceedings at the behest of an aggrieved party in order to compensate said party for damages caused by the injuring party. *Such a proceeding would necessarily punish for past acts.* The remedial action in such cases could result in a *compensatory* fine; in addition, confinement in prison could be imposed by the court in order to coerce payment of the compensatory fine, although, of course, the injuring party would have to be released if he paid the fine or showed his inability to pay the fine. The correct statement of the law in this respect was set forth in *Parker v. United States*, 126 F. 2d 370 (page 380) :

"It is well settled, however, that the court may, in a proceeding for civil contempt, impose the remedial punishment of a fine payable to an aggrieved litigant as compensation for the special damages he may have sustained by reason of the contumacious conduct of the offender. Gompers v. Buck's Stove & Range Co., 1911 221 U. S. 418, 448, 449, 31 S. Ct. 492, 55 L. Ed. 797, 34 L.R.A., N.S., 874; Lamb v. Cramer, 1932, 285 U. S. 217, 220, 221, 52 S. Ct. 315, 76 L. Ed. 715; Mer-chants' Stock & Grain Co. v. Board of Trade, 8 Cir., 1912, 201 F. 20, 30; Delaware, L. & W. R. Co. v. Frank, 2 Cir., 1916, 230 F. 988; American Graphophone Co. v. Walcutt, C.C.S.D.N.Y. 1898, 86 F. 468; Kreplik v. Couch Patents Co., 1 Cir., 1911, 190 F. 565, 569; Ray-mor Ballroom Co. v. Buck, 1 Cir., 1940, 110 F. 2d 207, 211; Aerovox Corp. v. Concourse Electric Co., 2 Cir., 1937, 90 F. 2d 615, 617; Lineker v. Dillon, D.C.N.D. Cal. 1921, 275 F. 460, 470, 476.

"If the district court should impose such a compensatory fine upon Parker and he should fail to pay it within the time specified in the contempt order, the court might, still as part of the remedial process, commit Parker to jail until he pays the fine or until further order of the court. Raymor Ballroom Co. v. Buck, 1 Cir., 1940, 110 F. 2d 207, 211, 212. Since the purpose of the commitment would be remedial merely, not punitive, the court would no doubt on application make an appropriate modification of its order if Parker were able to show his utter inability to pay the fine in whole or in part. See In re Byrd Coal Co., Inc., 2 Cir., 1936, 83 F. 2d 256." See also *McComb v. Jacksonville Paper Co.*, 336 U. S., supra; *Maggio v. Zeitz*, 333 U. S. 56; *Leman v. Krentler-Arnold Co.*, 284 U. S. 448, and *Parker v. United States*, 153 F. 2d 66.

*Gompers v. Bucks Stove & Range Co.*, 221 U. S., supra, is factually and legally analogous to the instant

case. In that case, the U. S. District Court found Samuel Gompers and others guilty of criminal contempt in violating an order of a court of equity restraining them from boycotting the complainant (Bucks Stove and Range Co.) by publishing statements that the complainant was guilty of unfair trade. The United States Supreme Court held that the contempt was *civil* in nature, and in reversing the action of the lower Court said (pages 441-444) : ". . . It is true that punishment by imprisonment may be remedial, as well as punitive, and *many civil contempt proceedings have resulted not only in the imposition of a fine, payable to the* complainant, but also in committing the defendant to prison. But imprisonment for civil contempt is ordered where the defendant has refused to do an affirmative act required by the provisions of an order which, either in form or substance, was mandatory in its character. Imprisonment in such cases is not inflicted as a punishment, but is intended to be remedial by coercing the defendant to do what he had refused to do. The decree in such cases is that the defendant stand committed unless and until he performs the affirmative act required by the court's order.

". . . The order for imprisonment in this class of cases, therefore, is not to vindicate the authority of the law, but is remedial and is intended to coerce the defendant to do the thing required by the order for the benefit of the complainant. If imprisoned, as aptly said in In re Nevitt, 117 Fed. Rep. 451, 'he carries the keys of his prison in his own pocket.' He can end the sentence and discharge himself at any moment by doing what he had previously refused to do.

"On the other hand, if the defendant does that which he has been commanded not to do, the disobedience is a thing accomplished. *Imprisonment cannot undo or remedy what has been done nor afford any*

*compensation for the pecuniary injury caused by the disobedience.* If the sentence is limited to imprisonment for a definite period, the defendant is furnished no key, and he cannot shorten the term by promising not to repeat the offense. Such imprisonment operates, not as a remedy coercive in its nature, but solely as punishment for the completed act of disobedience. . . .

"In this case the alleged contempt did not consist in the defendant's refusing to do any affirmative act required, but rather in doing that which had been prohibited. *The only possible remedial relief for such disobedience would have been to impose a fine for the use of complainant, measured in some degree by the pecuniary injury caused by the act of disobedience.* Rapalje on Contempt, §§131-134; Wells v. Oregon Co., 19 Fed. Rep. 20; In re North Bloomfield Co., 27 Fed. Rep. 795; Sabin v. Fogarty, 70 Fed. Rep. 483.

"But when the court found that the defendants had done what the injunction prohibited, and thereupon sentenced them to jail for fixed terms of six, nine and twelve months, no relief whatever was granted to the complainant, and the Bucks Stove & Range Company took nothing by that decree."

In *McComb v. Jacksonville Paper Co.*, 336 U. S., supra, a decree of the district court in a proceeding under the Fair Labor Standards Act enjoined the corporation from violating the minimum wage, over-time and record-keeping provisions of the Act. The corporation took no appeal. Three years later the Administrator instituted a *civil* contempt proceeding, alleging violations of the decree and requesting that the corporation, in order to purge itself of *past* acts of contempt, be required to make payment of the unpaid statutory wages to the employees affected. In sustaining the position of the Administrator, the United States Supreme Court held that the district court possessed

power to order the corporation, *in order to purge its contempt,* to pay to the affected employees the amounts of wages which were unpaid in violation of the Act. The Court further held that it was immaterial, inter alia, that a suit could have been brought by the employees under the statute to collect the amounts due.

The power of a Court to impose a compensatory fine is, however, not absolute and unrestricted.

In *United States v. United Mine Workers of America,* 330 U. S., supra, a federal district court *issued* a restraining order and *preliminary injunction* in favor of the Government to prevent a union and its officers from precipitating a nation-wide strike in the bituminous coal mines pending a judicial determination of the labor contract (called the Krug-Lewis agreement) between the Government and the union. The Government had taken over the mines. On October 21, 1946, John L. Lewis, the union's representative, requested that a conference be held beginning on November 1, 1946 (based on an alleged provision of the existing contract) for the purpose of negotiating new arrangements concerning wages, hours, practices, and other matters pertinent to the industry. Any contractual basis for requiring negotiations was denied by the Government. Nevertheless, conferences were begun on November 1, 1946, with both the Government and the union adhering to their opposing views. On November 15, 1946, Lewis notified Krug that in view of the fact that 15 days had elapsed since the beginning of the conferences, the United Mine Workers of America exercised its contractual option and terminated the Krug-Lewis agreement as of 12:00 o'clock p.m., Midnight, Wednesday, November 20, 1946. Krug replied that Lewis had no power to terminate the agreement. Thereupon, Lewis circulated to union members copies of his letter to Krug dated November 15th.

On November 18th, pursuant to a complaint filed by the Government, the lower court issued a temporary order restraining Lewis and the union from complying with the notice of November 15th, or encouraging the mine workers to interfere with the operation of the mines by strike or cessation of work, or to take any action which would interfere with the court's jurisdiction and its determination of the case. This order of the court was served on the defendants on November 18th. Nevertheless, a gradual walkout began on that day, and by midnight of November 20th, a full scale strike was in effect. Thereafter, after a trial on contempt charges, Lewis and the union were found guilty of *both* civil and criminal contempt. The proceedings for both civil and criminal contempt were amalgamated into a single trial. The lower court fined the defendant Lewis $10,000. and the defendant union $3,500,000. for *past* acts of contempt.

Upon appeal, the United States Supreme Court held that the trial court properly found Lewis and the union *guilty of both civil and criminal contempt.* The Court sustained a fine of $10,000 against Lewis for criminal contempt, but modified the fine imposed by the lower court upon the union. The Supreme Court ordered the union (a) to pay a fine of $700,000 and (b) to pay an additional fine of $2,800,000, unless the union complied with the lower court's temporary restraining order and preliminary injunction within five days of the Court's mandate. The Court said (pages 299-303):

". . . conduct can amount to both civil and criminal contempt. . . .

"Sentences for criminal contempt are punitive in their nature and are imposed for the purpose of vindicating the authority of the court. Gompers v. Bucks Stove & Range Co., supra, at page 441. The interests of orderly government demand that respect and compli-

ance be given to orders issued by courts possessed of jurisdiction of persons and subject matter. One who defies the public authority and willfully refuses his obedience, does so at his peril. In imposing a fine for criminal contempt, the trial judge may properly take into consideration the extent of the willful and deliberate defiance of the court's order, the seriousness of the consequences of the contumacious behavior, the necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring such acts in the future. Because of the nature of these standards, great reliance must be placed upon the discretion of the trial judge.

"The trial court properly found the defendants guilty of criminal contempt. *Such contempt had continued for 15 days from the issuance of the restraining order until the finding of guilty.* . . . This policy, as the evidence showed, was the germ center of an economic paralysis which was rapidly extending itself from the bituminous coal mines into practically every other major industry of the United States. It was an attempt to repudiate and override the instrument of lawful government in the very situation in which governmental action was indispensable.

"The trial court also properly found the defendants guilty of *civil* contempt. Judicial sanction in *civil* contempt proceedings may, in a proper case, be employed for either *or both* of two purposes: to coerce the defendant into compliance with the court's order, *and* to compensate the complainant for losses sustained. Gompers v. Bucks Stove & Range Co., supra, at pages 448, 449. Where compensation is intended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of complainant's actual loss, and his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy."

## Summary

To summarize what I believe is or must be the law of Pennsylvania, in order that "what the Constitution now fittingly calls the 'judicial power of the United States' [and of the States] would 'be a mere mockery' "* :

(1) A court may impose *summarily* (without a jury trial) a fine or imprisonment or both upon any person or persons for misconduct or other criminal contempt of court which is committed in the presence of the court or so near thereto as to interfere with its proceedings or obstruct the administration of justice: *Green v. United States,* 356 U.S. 165 (March 31, 1958) ; *Cox v. Cox,* 391 Pa., supra; *Knaus v. Knaus,* 387 Pa., supra.

(2) A court of equity may punish for indirect criminal contempt, subject to the limitations prescribed by the Act of June 23, 1931.** An indirect criminal

---

\* *United States v. United Mine Workers of America,* 330 U.S. 258, 290; *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 450.

\*\* *United States v. United Mine Workers of America,* 330 U.S. 258, and other cases hereinabove cited, as well as the necessity of supporting the inherent powers of a court to have its orders and decrees enforced, demonstrate the advisability of a legislative amendment to increase the fine of $100, which is prescribed by the Act of 1931. If, for example, a court restrained the erection of a 20 story apartment house in an area zoned highly residential, with a 2 or 3 story limited height for houses, and the owner of the property openly defied the court for two years by building and operating a 20 story apartment house, the imposition of a $100 fine (after conviction by a jury) would make a mockery of the court's power and decree. The importance and necessity of supporting a court's decree and sustaining its power and prestige, which a $100 fine utterly fails to do, is illustrated in the recent shocking case of the violation of the injunctive decree of a United States District Court in re, Central High School at Little Rock,

contempt consists of the violation or defiance of an order or decree of a court, outside the presence of the court: *Cox v. Cox,* 391 Pa., supra; *Knaus v. Knaus,* 387 Pa., supra.

(3) The same acts or conduct may constitute or amount to both civil and criminal contempt, and a person guilty of both may be punished for either or both: *United States v. United Mine Workers of America,* 330 U.S. 258, 290.

(4) The dominant purpose of a contempt proceeding generally determines whether it is civil or criminal contempt: *United States v. United Mine Workers of America,* 330 U.S., supra; *Gompers v. Bucks Stove & Range Co.,* 221 U.S., supra; *Cox v. Cox,* 391 Pa., supra; *Knaus v. Knaus,* 387 Pa., supra.

(5) A Court may punish for *civil* contempt, where the dominant purpose is to compensate the injured party, by imposing a fine or imprisonment or both, and the fine may be imposed for *past* acts of contempt. A compensatory fine for civil contempt, payable to the injured party, may be imposed, unlike an order of imprisonment, unconditionally. Such fine must of course be based upon evidence of the actual loss suffered by the injured party.

There was no evidence in the instant case of the complainant's financial loss, or that the fine was imposed to compensate complainant for its actual loss. For this reason, as well as for the reasons hereinabove stated, I concur in the result reached by the majority opinion.

Mr. Justice BENJAMIN R. JONES joins in this concurring opinion.

---

Arkansas, and the use by the President of the United States of armed federal troops to support the court's decree. Numerous other examples will occur to everyone.